~~SEALED~~ 

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>PAUL SIMPKINS,<br><br>Defendant. | Case No.: '15 MJ 0325<br><br>**COMPLAINT**<br><br>Title 18 U.S.C., Sec. 371–<br>Conspiracy To Commit Bribery |

The undersigned complainant being duly sworn states:

Beginning no later than May 2006, and continuing through at least September 2012, defendant PAUL SIMPKINS, a public official, and others did knowingly and unlawfully combine, conspire, and agree to commit bribery, in violation of Title 18, United States Code, Section 201(b)(2)(A), and SIMPKINS and his co-conspirators took overt acts in furtherance of the conspiracy; all in violation of 18 U.S.C. § 371. This criminal complaint is based on the attached affidavit, which is incorporated herein by reference.

Cordell DeLaPena, Special Agent, DCIS

SWORN TO BEFORE ME AND SUBSCRIBED IN MY PRESENCE, THIS 2d DAY OF FEBRUARY, 2015.

The Honorable Karen S. Crawford
United States Magistrate Judge

## **AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT**

I, CORDELL DELAPENA, being duly sworn, hereby depose and state as follows:

## **AFFIANT**

1. I am a Special Agent with the Department of Defense, Office of Inspector General, Defense Criminal Investigative Service ("DCIS"), Long Beach Resident Agency. I have been so employed since August 2012. Prior to my employment with DCIS, I was a Special Agent with the U.S. Department of the Interior, Office of Inspector General for approximately four years. I have received training in the investigation of various financial and white collar crimes and I have personally conducted or assisted in the investigation of violations of U.S. law including bribery, kickbacks, public corruption, conspiracy, theft, money laundering, conflicts of interest, mail fraud, and antitrust violations. I have prepared numerous affidavits to support the establishment of probable cause for search and arrest warrants.

2. This affidavit is intended only to demonstrate that there is probable cause for the requested arrest warrant and does not set forth all of my knowledge or that of the United States about this matter. The facts set forth in this affidavit are based upon my training and experience as well as my and members of the investigation's personal observations; review of email and other documents, telephone records, contracting records, and other evidence; interviews of witnesses; and review of physical evidence obtained during the course of this investigation.

3. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that from at least May 2006 to at least September 2012, Paul SIMPKINS ("SIMPKINS"), a former U.S. Department of Navy ("DoN") contracting official, combined and conspired to commit bribery in violation of 18 U.S.C. § 201(b)(2)(A). As set forth below, there is probable cause to believe that SIMPKINS corruptly demanded,

- 2 -

received, and accepted things of value, including cash and wire transfers, travel expenses, hotel rooms, and the services of prostitutes, from Leonard Glenn Francis ("Francis"), the owner of Glenn Defense Marine Asia Pte. Ltd. ("GDMA"), a defense contracting corporation headquartered in Singapore, and that in return for these things of value, SIMPKINS was influenced in the performance of his official acts, namely exercising his influence within the U.S. Navy to advocate for and advance GDMA's interests, as opportunities arose, by, among other things, advocating for and acting in furtherance of GDMA's award of U.S. Navy contracts and extensions of those contracts; providing Francis with internal, proprietary U.S. Navy information; and advocating for and acting on behalf of GDMA as questions, matters, and controversies regarding GDMA's ship husbanding business were brought to his attention in his official capacity with DoN.

4. On January 15, 2015, Francis pleaded guilty in the Southern District of California to one count of conspiring to bribe numerous U.S. Navy officers and employees, in violation of 18 U.S.C. § 371; one count of bribery of a federal law enforcement agent, in violation of 18 U.S.C. § 201; and one count of conspiring to defraud the United States in connection with the performance of his and GDMA's ship husbanding business, in violation of 18 U.S.C. § 371.

5. As defined by 18 U.S.C. § 3238, this offense was begun and committed on the high seas and otherwise out of the jurisdiction of any particular district, and thus, venue is proper for this offense in the Southern District of California, as the district in which one or more joint offenders, namely Francis, was arrested. Venue is independently anchored in the Southern District of California as the last known residence in the United States of a joint offender, namely NH.

## BACKGROUND

6. From in or around April 2005 through in or around June 2007, SIMPKINS served as a Supervisory Contract Specialist at the U.S. Navy Regional Contracting Center in Singapore. As a Supervisory Contract Specialist, SIMPKINS

supervised a staff of contracting officers and specialists who awarded and administered U.S. Navy contracts. In this role, SIMPKINS sat on Contract Review Boards, which were bodies that had the authority to recommend and approve bidders to receive the award of U.S. Navy contracts. From in or about June 2007 to in or about December 2007, SIMPKINS served as a Contracting Officer (Assistant Director), a GS-15 grade position, with the U.S. Department of Justice, Executive Office of United States Attorneys, in Washington, D.C. From in or about December 2007 through at least in or about August 2012, SIMPKINS served as an Assistant Director in the Department of Defense Office of Small Business Programs, located in Northern Virginia. SIMPKINS's responsibilities as an Assistant Director, which was a Senior Executive Service ("SES") position, included overseeing the award and administration of contracts let by the DoD's Office of Small Business Programs. At all times, SIMPKINS was a "public official" as defined by 18 U.S.C. § 201(a).

7. From at least 2005 through 2007, during his tenure as a Supervisory Contract Specialist at the U.S. Navy Regional Contracting Center, SIMPKINS resided in Singapore and was married to NH, a Japanese citizen. NH had a bank account at Mizuho Bank, Ltd. ("Mizuho Bank"), in Japan.

8. GDMA was a multi-national corporation with headquarters in Singapore and operating locations in other countries, including Japan, Singapore, Thailand, Malaysia, Korea, India, Hong Kong, Indonesia, Australia, Philippines, Sri Lanka, and the United States. GDMA was owned and controlled by Francis, who was the Chief Executive Officer and President, and who oversaw the daily business and operations of the company. Francis was assisted by a core management team, consisting of persons known to the investigation and identified here by initials: HP, Vice President Worldwide Contracts; NP, Vice President Global Operations; and AW, General Manager of Global Contracts.

9. GDMA's main business involved the "husbanding" of marine vessels, and as such, GDMA was known as a "husbanding service provider." "Husbanding"

involved the coordinating, scheduling, and direct and indirect procurement of items and services required by ships and submarines when they arrive in port. Examples of items and services required by ships and submarines when in port included tugboats, fenders, port authority/custom fees, security, provisions, fuel, water, trash removal, collection, holding and transfer of liquid waste ("CHT"), and transportation.

10. As of late 2005, GDMA held contracts with the U.S. Navy to provide husbanding services in Singapore and other Southeast Asian countries. At this time, however, the U.S. Navy had proposed awarding long-term, potentially extendable, contracts to provide ship husbanding services in Thailand ("the Thailand Contract) and the Philippines ("the Philippines Contract"). Francis and GDMA were poised to bid on any such contracts tendered by the U.S. Navy.

## PROBABLE CAUSE

11. According to a defendant who has pled guilty in this case and who is cooperating with the United States and may be motivated by hope of receiving a recommendation for a reduced sentence ("CW1"),[1] in early 2006, SIMPKINS advised Francis that in return for money, SIMPKINS could exercise his influence within the U.S. Navy to benefit GDMA by steering the Thailand and Philippines Contracts to GDMA. In the weeks and months that followed, Francis and SIMPKINS held a series of meetings in the bar of a hotel in Singapore during which they negotiated how much money Francis would pay in return for the exercise of SIMPKINS's influence. According to CW1, Francis initially proposed to pay SIMPKINS $50,000, which SIMPKINS rejected. Ultimately, SIMPKINS agreed to exercise his influence within the U.S. Navy to advocate for and advance GDMA's

---

[1] CW1 has provided other information in this investigation which has proven credible. Moreover, CW1's information is largely corroborated by email, travel records, bank records, and various contracting records which I have reviewed. Approximately 30 years ago, CW1 suffered a firearms-related criminal conviction in a foreign country. I am unaware of CW1 having other subsequent criminal history other than that related to the events in this case.

Case 3:15-cr-00530-JLS Document 1 Filed 02/02/15 PageID.6 Page 6 of 12

interests, as opportunities arose, by, among other things, advocating for and acting in furtherance of GDMA's award of U.S. Navy contracts and extensions of those contracts; providing Francis with internal, proprietary U.S. Navy information; and advocating for and acting on behalf of GDMA as questions, matters, and controversies regarding GDMA's ship husbanding business were brought to his attention in his official capacity with DoN; and in return, Francis agreed to, and did, pay SIMPKINS several hundred thousand dollars and provided SIMPKINS with other things of value, including travel and entertainment expenses, hotel rooms, and the services of prostitutes.

12. According to contracting records that I have reviewed, on or about February 28, 2006, the U.S. Navy awarded GDMA a contract to provide ship husbanding services in Thailand (Contract N40345-06-D-0001) (the "Thailand Contract"), which went into effect on March 1, 2006. The Thailand Contract was awarded for an initial amount of $929,649.20 and contained four one-year optional extension periods. SIMPKINS was part of the Source Selection Authority for the Thailand Contract, which made recommendations about which bidders should receive the Thailand Contract. On February 21, 2006, on behalf of Source Selection Authority, SIMPKINS signed a Business Clearance Memorandum which recommended award of the Thailand Contract to GDMA.

13. According to CW1, in or about early 2006, Francis provided SIMPKINS with an initial bribe payment of $50,000 in cash, placed in an envelope, during a meeting at the aforementioned hotel in Singapore.

14. According to CW1, in order to conceal and disguise the nature, source, and ownership of some of the bribe payments that SIMPKINS received from Francis, SIMPKINS falsely referred to them as a real estate investment in Japan and directed that the payments be made into NH's bank account at Mizuho Bank. According to CW1, in furtherance of this cover story, SIMPKINS used an email account belonging to his mistress, HY, to communicate with Francis about the bribe payments.

- 6 -

According to an email I have reviewed, on or about May 15, 2006, SIMPKINS, impersonating HY, sent a sham email to Francis describing a real estate investment. The email concluded by instructing Francis to deposit the money in the bank account of NH's bank account at Mizuho Bank and providing the account number.

15. According to bank records I have reviewed and corroborated by CW1, on or about May 16, 2006, Francis wired or caused to be wired to SIMPKINS approximately $100,000 to NH's account at Mizuho Bank.

16. On or about May 18, 2006, SIMPKINS forwarded an email to Francis which documented SIMPKINS's efforts to suspend a husbanding contractor that competed with GDMA for U.S. Navy contracts. This was proprietary U.S. Navy information which should not have been disclosed. In this email, which I reviewed, SIMPKINS boasted, "I did the research myself." According to CW1, CW1 believed SIMPKINS undertook to suspend this contractor based on Francis's prior request.

17. According to records that Mizuho Bank provided for NH's account pursuant to a Mutual Legal Assistance Treaty ("MLAT") request from the United States, NH received an incoming wire transfer of $99,983 on May 23, 2006. I have also reviewed records for SIMPKINS's bank account at Travis Credit Union. On May 24, 2006, SIMPKINS received an incoming wire in the amount of $69,990 originating from NH's account at Mizuho Bank.

18. According to email correspondence that I have reviewed, based on Francis's prompting, SIMPKINS acted to prevent officials with the U.S. Navy Fleet and Industrial Supply Center ("FISC"), a U.S. Navy command tasked with providing logistical support to U.S. Navy vessels, from reviewing invoices from GDMA, which may have revealed overbilling and fraud associated with various port visits. Specifically, according to email correspondence that I have reviewed, on June 13, 2006, a FISC official requested that a U.S. Navy Supply Officer aboard the USS Decatur provide copies of all invoices that GDMA submitted in connection with the ship's recent port visit in Hong Kong. On or about June 16, 2006, Francis sent

1  SIMPKINS an email advising that the FISC official had asked for GDMA's invoices.
2  Later that day, SIMPKINS sent an email to the FISC official who requested the
3  invoices, instructing "do not request any invoices from the ship... Do not violate this
4  instruction. Contact the ship and rescind your request."

5       19.    According to email and airline travel records that I reviewed, on or
6  about June 16, 2006, Francis paid for SIMPKINS's first class, roundtrip airfare from
7  Singapore to Bangkok, Thailand.

8       20.    I reviewed an email dated July 2, 2006 from SIMPKINS to Francis in
9  which SIMPKINS stated, "[H]ere is my wife's info again to use next week. My wife
10 will monitor account to ensure its [sic] dispersed and invested immediately." The
11 email again provided the account details for NH's account at Mizuho Bank.

12      21.    According to email I reviewed dated July 8, 2006, Francis instructed a
13 GDMA employee to transmit $50,000 to NH's account at Mizuho Bank. According
14 to records provided pursuant to the MLAT, NH's account received a wire transfer in
15 the amount of $50,000 on July 11, 2006. According to records provided by Travis
16 Credit Union, on or about July 19, 2006, SIMPKINS's account received an incoming
17 wire in the amount of $44,990 originating from NH's account at Mizuho Bank.

18      22.    I reviewed an email dated October 13, 2006, concerning another bribe
19 payment to SIMPKINS, in which a GDMA employee wrote to Francis: "Dear Boss,
20 Attached is the fund transfer document from [Money Transmitter] for the USD50K
21 transfer to [NH]. . . ." Attached to the email was a facsimile containing a wire
22 transfer confirmation for the transfer of $50,000 into NH's bank account at Mizuho
23 Bank. Records provided by Mizuho Bank confirm the wire transfer in the amount of
24 $50,000 on October 16, 2006. Records provided by Travis Credit Union indicate
25 that on or about October 17, 2006, SIMPKINS's account received an incoming wire
26 in the amount of $39,990 originating from NH's account at Mizuho Bank.

23. According to CW1, in addition to the wire transfer payments made to SIMPKINS via NH's account, Francis hand-delivered to SIMPKINS at least $150,000 in cash, placed into envelopes, during meetings at a hotel in Singapore.

24. On or about December 6, 2006, a U.S. Navy Lieutenant assigned to FISC issued a Contractor Performance Rating, which is maintained in the contract file for the Thailand Contract. In the Contractor Performance Rating, the Lieutenant recommended against exercising GDMA's first option to extend the Thailand Contract, which would open the contract up for competitive bidding. In the rating, the Lieutenant wrote: "I recommend against exercising the first option year at this time. . . There are far too many exceedingly high cost, non-CLIN [Contract Line Item] items (particularly [Force Protection] items) that ships routinely use/need. I recommend recompeting this contract at this time . . . to draw competition from other contractors and drive prices down in the best interest of the U.S. Government." In a Memorandum dated December 13, 2006, SIMPKINS overruled the Lieutenant's decision and exercised a one-year option on GDMA's contract without re-opening the contract to competitive bidding. In fact, as part of their respective pleas of guilty, Francis and GDMA have admitted to over-charging the U.S. Navy on non-contract line items (i.e. Incidentals) related to GDMA's ship husbanding contracts.

25. According to contracting records I have reviewed, on or about December 11, 2006, the U.S. Navy awarded GDMA a contract to provide ship husbanding services in the Philippines (Contract N40345-07-D-0001) (the "Philippines Contract"). The Philippines Contract was awarded for an initial amount of $523,994. The Philippines Contract was awarded by a Contracting Officer and administered by a Contracting Specialist supervised by SIMPKINS.

26. According to email correspondence that I have reviewed, on or about January 29, 2007, SIMPKINS issued an instruction to FISC in Hong Kong requiring it to discontinue the use of flow meters that monitored the volume of liquid waste ("CHT") that GDMA removed from U.S. Navy ships. The use of these meters would

have ensured proper accounting of the actual amount of CHT removed, while prohibiting the use of these meters allowed GDMA to continue to fraudulently inflate the amount of CHT removed, and thereby over-bill the U.S. Navy for its services.

27. According to email I reviewed, dated March 15, 2007, a GDMA employee wrote to Francis: "Dear Boss, For the payment of US$50k to Japan, the payee information that I can retrieve from our past record is: [NH] MIZUHO BANK OTSUKA BRANCH A/C NO. [account number]. I will ask [Money Transmitter] to transfer the funds to [NH] tomorrow." Records provided by Mizuho Bank confirm a wire transfer to NH's account in the amount of $50,000 on March 19, 2007. Records provided by Travis Credit Union indicate that on or about March 20, 2007, SIMPKINS's account received an incoming wire in the amount of $39,990 originating from NH's account at Mizuho Bank.

28. According to CW1 and many emails during this period, which I have reviewed, between SIMPKINS's departure from FISC Singapore in 2007 and 2012, SIMPKINS and Francis continued an ongoing relationship, wherein SIMPKINS repeatedly contacted Francis inquiring for a job and other favors. For example, in May 2008, SIMPKINS contacted Francis via email informing him of NH's death. Attached to this email were medical bills, which, according to CW1, was a request from SIMPKINS to Francis for money. In return for these requests for money and other things of value, throughout this period, according to email I have reviewed and corroborated by CW1, SIMPKINS offered Francis various assistance, as opportunities arose, including with "law and litigation," when he worked for the Department of Justice, and connections to high-ranking officials, such as the Secretary of Defense, when he worked for the Department of Defense.

29. According to email I have reviewed and corroborated by CW1, in or about August 2012, Francis encouraged SIMPKINS to apply for the job as the Director of Contracting at FISC in Yokosuka, Japan. This position would have provided SIMPKINS with renewed opportunities to use his influence on GDMA's

behalf, including by trying to steer additional husbanding contracts to GDMA. I reviewed an email that SIMPKINS sent to Francis on or about August 12, 2012 regarding "Vacancy at Yokosuka" in which SIMPKINS asked Francis, "Can U provide me the Commander in charge their [sic] and LtCdr in charge of contracting names and email addresses? I will send Letters of Recommendations." Later that day, Francis forwarded this email to Jose Sanchez, a Commander in the U.S. Navy and Executive Officer of the FISC in Yokosuka, whom Francis also bribed with cash, travel expenses, and the services of prostitutes. In this email, Francis wrote, "Bro, we have to influence the hire of Paul Simpkins to take the GS15 position. He is a bud of mine. Who will decide with the hire and please provide the POC."

30. According to a travel itinerary I have reviewed, SIMPKINS traveled from Washington, D.C. to Singapore from September 6-16, 2012. Prior to his departure, in an email of on or about August 10, 2012, SIMPKINS forwarded Francis his itinerary and asked Francis to get him a hotel room. On or about August 13, 2012, Francis forwarded SIMPKINS a confirmation for the Hilton Hotel on Orchard Road in Singapore, at a cost of 2,530.55 Singapore Dollars.

31. I reviewed an email that SIMPKINS sent to Francis on or about August 29, 2012, as his departure neared, regarding "September 11." In the body of the email, SIMPKINS asked Francis, "Can u set up some clean, disease free wome[n] when I am there?" In a second email sent on or about September 6, 2012, SIMPKINS wrote to Francis: "I will arrive in Singapore on 11 September. Whats [sic] the plan to meet up and maybe do some honey's?" That day, Francis confirmed, writing: "Honeys and bunnys." According to CW1, Francis did, in fact, provide SIMPKINS with the services of prostitutes on this occasion.

32. In the aggregate, from May 2006 until September 2012, in return for SIMPKINS corruptly exercising his influence within the U.S. Navy to advocate for and advance GDMA's interests, as opportunities arose, by, among other things, advocating for and acting in furtherance of GDMA's award of U.S. Navy contracts

and extensions of those contracts; providing Francis with internal, proprietary U.S. Navy information; and advocating for and acting on behalf of GDMA as questions, matters, and controversies regarding GDMA's ship husbanding business were brought to his attention in his official capacity with DoN, Francis agreed to, and did, pay SIMPKINS at least several hundred thousand dollars in cash and wire transfers, and provided SIMPKINS with other things of value, including travel and entertainment expenses, hotel rooms and the services of prostitutes.

## CONCLUSION

33. Based on the foregoing, I respectfully submit that there is probable cause to believe that, from at least May 2006 through at least September 2012, PAUL SIMPKINS, Francis, and others knowingly and unlawfully combined and conspired to commit bribery in violation of 18 U.S.C. § 201(b)(2)(A), and that SIMPKINS and his co-conspirators took overt acts in furtherance of the conspiracy; all in violation of 18 U.S.C. § 371.

_____
Cordell DeLaPena, Special Agent, DCIS

Subscribed and sworn to before me this 2d day of February.

_____
THE HONORABLE KAREN S. CRAWFORD
UNITED STATES MAGISTRATE JUDGE

DATED: February 2, 2015