FILED

2015 FEB 31  AM 11:41

CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY  TH  DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

September 2013 Grand Jury

| UNITED STATES OF AMERICA, | Case No. 15CR0530 JLS |
|---|---|
| Plaintiff, | INDICTMENT |
| v. | Title 18, U.S.C., Sec. 371 - Conspiracy; Title 18, U.S.C., Sec. 981(a)(1)(c), and Title 28, U.S.C., Sec. 2461(c) - Criminal Forfeiture |
| PAUL SIMPKINS, | |
| Defendant. | |

The grand jury charges:

**INTRODUCTORY ALLEGATIONS**

1.  From in or around April 2005 through in or around June 2007, defendant PAUL SIMPKINS served as a Supervisory Contract Specialist at the U.S. Navy Regional Contracting Center in Singapore. As a Supervisory Contract Specialist, SIMPKINS supervised a staff of contracting officers and specialists who awarded and administered U.S. Navy contracts. In this role, SIMPKINS sat on Contract Review Boards, which were bodies that had the authority to recommend and approve bidders to receive the award of U.S. Navy contracts. During his tenure as a Supervisory Contract Specialist at the U.S. Navy Regional Contracting Center, SIMPKINS resided in Singapore and was married to

MWP:RSH:nlv:San Diego
3/2/15

NH, a Japanese citizen. NH had a bank account at Mizuho Bank, Ltd. ("Mizuho Bank"), in Japan.

2. From in or about June 2007 to in or about December 2007, SIMPKINS served as a Contracting Officer (Assistant Director of Acquisitions Staff), a GS-15 grade position, with the U.S. Department of Justice, Executive Office of United States Attorneys, in Washington, D.C.

3. From in or about December 2007 through at least in or about August 2012, SIMPKINS served as an Assistant Director in the Department of Defense Office of Small Business Programs, located in Northern Virginia. SIMPKINS's responsibilities as an Assistant Director, which was a Senior Executive Service ("SES") position, included overseeing the award and administration of contracts let by the Department of Defense's ("DoD") Office of Small Business Programs.

4. At all times material herein, SIMPKINS was a "public official" within the definition of Title 18, United States Code, Section 201(a)(1).

5. It was a violation of SIMPKINS'S official and lawful duties to enrich himself by using his position and influence within the U.S. Navy to promote the interests of a company under contract with the U.S. Navy.

6. At least as early as 2005, while he was working for the U.S. Navy in Singapore, SIMPKINS first met representatives of Glenn Defense Marine (Asia) ("GDMA"), a multi-national corporation headquartered in Singapore, with operating locations in several other countries, including Japan, Thailand, Malaysia, Korea, Hong Kong, Indonesia, Australia, the Philippines, and the United States. Leonard Glenn

Francis ("Francis"), a citizen of Malaysia who resided in Singapore, was the owner, president, and Chief Executive Officer of GDMA.

7. GDMA's main business involved the "husbanding" of marine vessels, a service it had provided to the U.S. Navy across Asia under various contracts for over 25 years. "Ship husbanding" involved the coordinating, scheduling, and direct and indirect procurement of items and services required by ships and submarines when those vessels arrive at port. Examples of these items and services included tugboats; fenders; port authority or customs fees; security; food; fuel; water; trash removal; collection, holding, and transfer of liquid waste ("CHT"); and transportation.

8. As of late 2005, GDMA held contracts with the U.S. Navy to provide husbanding services in Singapore and other Southeast Asian countries. At this time, however, the U.S. Navy had proposed awarding long-term, potentially extendable contracts to provide ship husbanding services in Thailand ("the Thailand Contract") and the Philippines ("the Philippines Contract"). Francis and GDMA were poised to bid on any such contracts tendered by the U.S. Navy.

9. At all times material herein, the U.S. Navy Fleet and Industrial Supply Center ("FISC"), was a U.S. Navy command tasked with providing logistical support to U.S. Navy vessels.

### Count 1 - Conspiracy (18 U.S.C. § 371)

10. From in or about May 2006 through at least September 2012, on the high seas and outside the jurisdiction of any particular district, defendant PAUL SIMPKINS, a public official, Leonard Glenn Francis, charged elsewhere, and others (1) knowingly and unlawfully combined, conspired, and agreed to commit bribery, that is, SIMPKINS, Francis, and others, knowingly agreed that, in return for SIMPKINS

3

being influenced in the performance of official acts and being induced to do and omit to do acts in violation of his official and lawful duties, all as opportunities arose, (a) Francis would directly and indirectly, corruptly give, offer, and promise things of value to SIMPKINS, including cash, travel expenses, entertainment, and the services of prostitutes, and (b) SIMPKINS would directly and indirectly, corruptly demand, seek, receive, accept, and agree to receive and accept these things of value; and (2) SIMPKINS and Francis took overt acts in furtherance of this conspiracy and to effect its unlawful object, in violation of Title 18, United States Code, Sections 201(b)(1)(A) and (C) and 201(b)(2)(A) and (C).

## OBJECT OF THE CONSPIRACY

11. It was the object of the conspiracy for SIMPKINS to use his position and influence in the U.S. Navy to advocate for and advance GDMA's interests, as opportunities arose, by, among other things, advocating for and acting in furtherance of GDMA's award of U.S. Navy contracts and extensions of those contracts; providing Francis with internal U.S. Navy information; and advocating for and acting on behalf of GDMA as questions, matters, and controversies regarding GDMA's ship husbanding business were brought to his attention. In return, Francis and others would offer things of value to or on behalf of SIMPKINS, including cash, travel expenses, entertainment, and the services of prostitutes.

## METHODS AND MEANS OF THE CONSPIRACY

12. In furtherance of this conspiracy, and to accomplish its object, the following methods and means were used, among others:

   a. SIMPKINS would demand, seek, receive, and accept things of value from Francis.

      b.    Francis would offer and give things of value to or on behalf of SIMPKINS, including cash, travel expenses, entertainment, and the services of prostitutes.

      c.    In return for these things of value, SIMPKINS would use his position and influence in the U.S. Navy to advocate for and advance GDMA's interests, as opportunities arose.

      d.    SIMPKINS would attempt to conceal the nature and source of the bribe payments that he received from Francis by instructing Francis to transmit the payments to NH's account at Mizuho Bank; using email accounts in the names of others – including an email account in the name of his mistress – to communicate with Francis; and by falsely referring to the bribe payments as a real estate investment during communications with Francis.

      e.    SIMPKINS undertook efforts to thwart the U.S. Navy's efforts to determine whether GDMA was over-billing the U.S. Navy on ship husbanding contracts by, among other things, instructing U.S. Navy officials not to review invoices submitted by GDMA and by requiring U.S. Navy officials to discontinue the use of flow meters that would have made it more difficult for GDMA to over-bill the U.S. Navy for the removal of liquid waste.

## OVERT ACTS

13.    In furtherance of the conspiracy and to effect its object, the following overt acts, among others, were committed:

      a.    On or about February 21, 2006, on behalf of the Source Selection Authority, SIMPKINS signed a Business Clearance Memorandum which recommended that GDMA receive a contract to provide ship husbanding services in Thailand (Contract N40345-06-D-0001) (the "Thailand Contract"), which the U.S. Navy ultimately awarded to GDMA

1  for an initial amount of $929,649.20 and which went into effect on
2  March 1, 2006.
3         b.   In or about early 2006, Francis provided SIMPKINS with
4  an initial bribe payment of $50,000 in cash, placed in an envelope,
5  during a meeting at a hotel in Singapore. Throughout the course of
6  SIMPKINS and Francis's bribery relationship, Francis provided SIMPKINS
7  with at least $150,000 in cash payments.
8         c.   On or about May 15, 2006, SIMPKINS, impersonating his
9  mistress, YH, sent a sham email to Francis describing a real estate
10 investment and instructing Francis to deposit money in NH's bank
11 account at Mizuho Bank and providing the account number.
12        d.   On or about May 16, 2006, Francis directed that 100,000
13 be wired to NH's account at Mizuho Bank.
14        e.   On or about May 18, 2006, SIMPKINS forwarded an email
15 to Francis which documented SIMPKINS's efforts to suspend a husbanding
16 contractor that competed with GDMA for U.S. Navy contracts. This was
17 proprietary U.S. Navy information which should not have been
18 disclosed. In this email, SIMPKINS boasted, "I did the research
19 myself."
20        f.   On or about May 23, 2006, Francis provided SIMPKINS
21 with $99,983 by causing the funds to be wired to NH's account at
22 Mizuho Bank.
23        g.   On or about June 16, 2006, Francis sent SIMPKINS an
24 email advising that a FISC official aboard the USS Decatur had asked
25 GDMA to provide copies of all invoices that GDMA had submitted in
26 connection with the ship's recent port visit in Hong Kong. Later that
27 day, SIMPKINS prevented the FISC official from reviewing the invoices,
28 which may have revealed over-billing and fraud by GDMA, by sending an

email to the FISC official, which instructed "do not request any invoices from the ship. . . Do not violate this instruction. Contact the ship and rescind your request."

  h. On or about June 16, 2006, Francis paid for SIMPKINS'S first class, roundtrip airfare from Singapore to Bangkok, Thailand.

  i. On or about July 2, 2006, SIMPKINS sent an email to Francis in which he provided the account details for NH's account at Mizuho Bank and wrote, "here is my wife's info again to use next week. My wife will monitor account to ensure its [sic] dispersed and invested immediately."

  j. On or about July 8, 2006, Francis instructed a GDMA employee to transmit $50,000 to NH's account at Mizuho Bank. On or about July 22, 2006, NH's account at Mizuho Bank received a wire transfer in the amount of $50,000.

  k. On or about October 16 2006, Francis provided SIMPKINS with $50,000 by causing the funds to be wired to NH's account at Mizuho Bank.

  l. On or about December 6, 2006, a U.S. Navy Lieutenant assigned to the FISC issued a Contractor Performance Rating, in which he recommended against exercising GDMA's first option to extend the Thailand Contract, an outcome that would have opened the contract up to competitive bidding. In the rating, the Lieutenant wrote: "I recommend against exercising the first option year at this time. . . There are far too many exceedingly high cost, non-CLIN [Contract Line Item] items (particularly [Force Protection] items) that ships routinely use/need. I recommend recompeting this contract at this time . . . to draw competition from other contractors and drive prices down in the best interest of the U.S. Government." In a Memorandum

1  dated December 13, 2006, SIMPKINS overruled the Lieutenant's decision
2  and exercised a one-year option on GDMA's contract without re-opening
3  the contract to competitive bidding.  Francis and GDMA continued to
4  overcharge the U.S. Navy on non-contract line items (<u>i.e.</u> Incidentals)
5  related to GDMA's ship husbanding contracts.

6          m.    On or about December 11, 2006, the U.S. Navy awarded
7  GDMA a contract to provide ship husbanding services in the Philippines
8  (Contract N40345-07-D-0001) (the "Philippines Contract").  The
9  Philippines Contract was awarded for an initial amount of $523,994.
10 The Philippines Contract wasadministered by a Contracting Specialist
11 supervised by SIMPKINS.

12         n.    On or about January 29, 2007, SIMPKINS issued an
13 instruction to the FISC in Hong Kong requiring it to discontinue the
14 use of flow meters that monitored the volume of CHT that GDMA removed
15 from U.S. Navy ships.  The use of these meters would have ensured
16 proper accounting of the actual amount of CHT removed, while
17 prohibiting the use of these meters allowed GDMA to continue to
18 fraudulently inflate the amount of CHT removed, and thereby over-bill
19 the U.S. Navy for its services.

20         o.    On or about March 19, 2007, Francis provided SIMPKINS
21 with $50,000 by causing the funds to be wired to NH's account at
22 Mizuho Bank.

23         p.    On or about May 10, 2007, SIMPKINS forwarded Francis an
24 electronic copy of a letter documenting that he had been offered a
25 position as a Contracting Officer and Assistant Director with the U.S.
26 Department of Justice, Executive Office of United States Attorneys.
27 In the email, SIMPKINS wrote "I wanted to inform you of the attached
28 offer and that I want to accept it. . . Of course, I will keep in

touch and do whatever I can as a friend to promote our relationship." In another email dated May 10, 2007, SIMPKINS wrote to Francis that "the job is at the Justice Department where all the pentagon Lawyers work at. I could be beneficial from there as well in terms of law and litigation when the right time comes."

  q. On or about December 27, 2007, the U.S. Navy and GDMA executed a modification which extended the period of performance for the Philippines contract from January 1, 2008 through February 29, 2008.

  r. On or about May 8, 2008, SIMPKINS sent Francis an email in which he used the occasion of his wife's death to seek additional payments from Francis. SIMPKINS attached to the email a copy of his late wife's death certificate and medical bills. In the body of the email, SIMPKINS wrote "[t]hank you for your friendship and welfare of me and my wife."

  s. On or about December 10, 2008, Francis sent SIMPKINS an email advising that GDMA had received additional U.S. Navy ship husbanding contracts: "[w]e took the entire [area of responsibility] including Viet n Cambodia. All th[at] is left is Aust, Korea and VLAD." In a response on or about December 11, 2008, SIMPKINS wrote "I am retiring this year; let me know if I can provide any support on your end; especially in Japan." In another email later that day, SIMPKINS encouraged Francis to obtain additional U.S. Navy contracts: "How abou[t] Guam and Korea? Might as well complete the course; add on Okinawa, Japan for more profit. Keep in touch I want to retire in the [area of responsibility] and will accept any good offer you present to me."

t. On or about February 8, 2010, the U.S. Navy and GDMA modified the Thailand contract by extending performance for an additional year. This modification increased the contract value by approximately $962,499.20.

u. On or about November 22, 2011, SIMPKINS wrote an email to Francis in which he requested a job at GDMA: "[y]ou know I want to work in Philippines, Malaysia, Japan with Singapore being last. Do you have any vacancies in any of those countries. [sic]. Legally, I can work for your company because the 3 years have expired and I have been working with Small Businesses. In the interim, I will [sic] looking for a retired [contracting officer] for you. I think I know what type you are looking knowing your business saavy [sic] and portfolio. Please review my application for consideration for employment in the countries I mentioned." During the months that followed, SIMPKINS sent Francis several emails inquiring about the status of his application. On February 6, 2012, SIMPKINS asked "does my friendship warrant any opportunities in your company upon retirement?"

v. In or about August 2012, Francis encouraged SIMPKINS to apply for the job as the Director of Contracting at the FISC in Yokosuka, Japan, a position that would have provided SIMPKINS with renewed opportunities to use his influence on GDMA's behalf, including by trying to steer additional husbanding contracts to GDMA. On or about August 12, 2012, SIMPKINS sent an email to Francis regarding "Vacancy at Yokosuka" in which SIMPKINS asked Francis, "Can U provide me the Commander in charge their [sic] and LtCdr in charge of contracting names and email addresses? I will send Letters of Recommendations." Later that day, Francis forwarded this email to

Jose Sanchez, a Commander in the U.S. Navy and Executive Officer of the FISC in Yokosuka, whom Francis also bribed with cash, travel expenses, and the services of prostitutes. In this email, Francis wrote, "Bro, we have to influence the hire of Paul Simpkins to take the GS15 position. He is a bud of mine. Who will decide with the hire and please provide the POC. [sic]."

w. On or about August 10, 2012, SIMPKINS asked Francis to get him a hotel room in Singapore. On or about August 13, 2012, Francis forwarded SIMPKINS a confirmation for the Hilton Hotel on Orchard Road in Singapore, at a cost of 2,530.55 Singapore Dollars.

x. On or about August 29, 2012, as SIMPKINS's departure for the trip described in the preceding paragraph neared, SIMPKINS sent an email to Francis regarding "September 11" in which SIMPKINS asked, "[c]an u set up some clean, disease free wome[n] when I am there?" In a second email sent on or about September 6, 2012, SIMPKINS wrote to Francis: "I will arrive in Singapore on 11 September. Whats [sic] the plan to meet up and maybe do some honey's [sic]?" That day, Francis confirmed, writing: "Honeys and bunnys." In fact, Francis provided SIMPKINS with the services of prostitutes on this occasion.

All in violation of Title 18, United States Code, Section 371.

### FORFEITURE ALLEGATIONS

14. The allegations set forth in Counts 1 and 2 of this Indictment are incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(c), and Title 28, United States Code, Section 2461(c).

15. Pursuant to Federal Rule of Criminal Procedure 32.2, notice is hereby given to the above-named defendant that the United States will seek forfeiture as part of any sentence in accordance with Title 18, United States Code, Section 981(a)(1)(c), and Title 28, United States Code, Section 2461(c), including but not limited to all property, real or personal, which constitutes or is derived from proceeds traceable to any bribery conspiracy, as alleged in this Indictment.

All pursuant to Title 18, United States Code, Section 981(a)(1)(c), and Title 28, United States Code, Section 2461(c).

DATED: March 3, 2015.

A TRUE BILL:

_____
Foreperson

LAURA E. DUFFY
United States Attorney

By: _____
MARK W. PLETCHER
Assistant U.S. Attorney

By: _____
ROBERT S. HUIE
Assistant U.S. Attorney

WILLIAM J. STELLMACH
Acting Chief, Fraud Section

Criminal Division

By: _____
CATHERINE VOTAW
BRIAN R. YOUNG
Trial Attorneys
Fraud Section, Criminal Division

12