1                    THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF CALIFORNIA
2

3                     HONORABLE JANIS L. SAMMARTINO
                   UNITED STATES DISTRICT JUDGE PRESIDING
4

5      ------------------------------------------------------------

6      UNITED STATES OF AMERICA,        )
                                        )  NO. 15-CR-0530-JLS
7                       PLAINTIFF,      )
                                        )
8      VS.                              )  JANUARY 8, 2016
                                        )
9      PAUL SIMPKINS,                   )
                                        )  MOTION HEARING
10                      DEFENDANT.      )

11     ------------------------------------------------------------

12

13     APPEARANCES:

14

15     FOR THE PLAINTIFF:       MARK PLETCHER
                                U.S. ATTORNEY'S OFFICE
16                              SOUTHERN DIST. OF CALIFORNIA
                                CRIMINAL DIVISION
17                              880 FRONT STREET, SUITE 6293
                                SAN DIEGO, CA  92101

18

19     FOR THE DEFENDANT:       JOHN C. LEMON
                                LAW OFFICES OF JOHN C. LEMON, APC
20                              1350 COLUMBIA STREET, SUITE 600
                                SAN DIEGO, CA  92101

21

22

23

24

25     THE COURT REPORTER:      GAYLE WAKEFIELD, RPR, CRR

```
 1     JANUARY 8, 2016

 2                           MORNING SESSION

 3              THE CLERK:  NUMBER 5 ON THE CALENDAR, 15-CR-530, UNITED

 4     STATES VS. PAUL SIMPKINS, FOR MOTION HEARING.

 5              MR. PLETCHER:  GOOD MORNING, YOUR HONOR, MARK PLETCHER

 6     FOR THE UNITED STATES.

 7              THE COURT:  THANK YOU.  GOOD MORNING.

 8              MR. LEMON:  GOOD MORNING, YOUR HONOR, JOHN LEMON FOR

 9     MR. SIMPKINS, WHO IS IN CUSTODY AND SHOULD BE OUT SHORTLY.

10     (THE DEFENDANT ENTERS THE COURTROOM.)

11              THE DEFENDANT:  GOOD MORNING, MA'AM.

12              THE COURT:  GOOD MORNING, SIR.

13              THE COURT HAS READ WHAT'S BEEN SUBMITTED FOR TODAY'S

14     HEARING.  I'VE READ THE MOTION TO REVOKE THE MAGISTRATE JUDGE'S

15     ORDER OF DETENTION AND SET REASONABLE BAIL, AND THE TRANSCRIPT

16     THAT'S ATTACHED.  I'VE READ THE GOVERNMENT'S RESPONSE IN

17     OPPOSITION, AND THE INTERVIEW THAT'S ATTACHED TO THAT.  I'VE

18     RECEIVED THIS MORNING, AND HAD AN OPPORTUNITY TO REVIEW, WHAT I

19     HAVE FROM PRETRIAL SERVICES, AND THEY ARE REPRESENTED HERE

20     TODAY AT OUR HEARING.

21              SO PLEASE GO AHEAD, MR. LEMON.

22              MR. LEMON:  THANK YOU, YOUR HONOR.  YOUR HONOR, I GUESS

23     I'LL START WITH MY PROPOSAL AND THEN WORK THROUGH THE 3142(G)

24     FACTORS.

25              THE COURT:  OKAY.
```

2

1          MR. LEMON:  THE SHORT VERSION OF THIS IS MR. SIMPKINS

2     UNDENIABLY HAS SOME TIES TO FOREIGN COUNTRIES.  THAT WAS THE

3     NATURE OF THE BUSINESS THAT HE WAS IN FOR AROUND 20 YEARS AFTER

4     HE WAS HONORABLY DISCHARGED FROM THE AIR FORCE, AND IT'S

5     BECAUSE OF THOSE TIES THAT I'M NOT ASKING YOUR HONOR TO SET AN

6     UNSECURED BOND, BUT DETENTION IS NOT APPROPRIATE HERE.

7     UNFORTUNATELY, MR. SIMPKINS DOES NOT HAVE REAL PROPERTY WITH

8     EQUITY, SO WHAT I'M PROPOSING IS A $150,000 BOND SECURED BY --

9     I'M SORRY, A CORPORATE SURETY BOND.  I'VE SPOKEN TO A BAIL

10    BONDSMAN WHO DOES FEDERAL CORPORATE BONDS, AND HIS NAME IS

11    JASON MEYERSON.  I SPOKE TO HIM EARLIER TODAY, AND HE IS

12    WILLING TO DO A CORPORATE SURETY BOND HERE AND WOULD, OF

13    COURSE, PARTICIPATE IN A NEBBIA HEARING.

14         I'M ASKING THAT THE COURT SET REASONABLE CONDITIONS,

15    WHICH IS TO RESTRICT MR. SIMPKINS' TRAVEL TO THE SOUTHERN

16    DISTRICT OF CALIFORNIA.  HE DOESN'T NEED TO GO ANYPLACE ELSE.

17    HE REPRESENTS TO ME THAT HE WOULD BE ABLE TO FIND

18    ACCOMMODATIONS AT ONE OF THOSE EXTENDED STAY TYPE HOTELS, AND

19    HE ALSO WOULD SUBMIT TO SOME FORM OF ELECTRONIC MONITORING,

20    WHETHER THAT BE A CALL-IN, AN ANKLE BRACELET, WHATEVER THE

21    COURT BELIEVES IS APPROPRIATE.  HE'S ALREADY SURRENDERED HIS

22    PASSPORT.  WHAT HE REALLY WANTS IS SIMPLY TO BOND OUT SO THAT

23    HE CAN SPEND SOME TIME WITH HIS WIFE AND CHILD BEFORE HE

24    RETURNS TO CUSTODY.

25         THE COURT:  ARE THEY HERE?

1            MR. LEMON:  THEY ARE NOT HERE, BUT THEY WILL BE HERE

2     IF HE MAKES BAIL.  HIS WIFE IS CURRENTLY IN SHANGHAI CARING FOR

3     HER MOTHER, WHO IS I BELIEVE TERMINALLY ILL, BUT I CORRESPOND

4     WITH HER ALMOST DAILY, AND SHE STATES THAT SHE WILL COME BACK

5     IF MR. SIMPKINS IS RELEASED ON BOND.

6            SIMILARLY, HE HAS A 1-YEAR-OLD SON THROUGH A SURROGATE

7     MOTHER IN THAILAND, AND SHE ALSO -- HIS SON ALSO WOULD COME

8     BACK TO BE WITH HIM FOR THE PENDENCY OF HIS PRETRIAL RELEASE.

9            THE COURT:  HIS WIFE IS A U.S. CITIZEN?

10           MR. LEMON:  HIS WIFE IS A U.S. CITIZEN, A NATURALIZED

11    U.S. CITIZEN.

12           THE COURT:  AND HIS CHILD?

13           MR. LEMON:  HIS CHILD IS A U.S. CITIZEN.  I APOLOGIZE,

14    HE MAILED ME A COPY OF HIS SON'S PASSPORT.  I MEANT TO BRING IT

15    WITH ME, AND I LEFT IT SITTING ON MY DESK.

16           THE COURT:  MY QUESTION IS, THEY HAVE THE ABILITY TO

17    COME HERE?

18           MR. LEMON:  YES, ABSOLUTELY.

19           THE COURT:  KEEP GOING.

20           MR. LEMON:  SO TURNING TO THE 3142(G) FACTORS, THE

21    FIRST FACTOR IS OBVIOUSLY THE NATURE AND CIRCUMSTANCES OF THE

22    OFFENSE, AND THE MOST SALIENT FACTOR HERE IS THAT THIS IS NOT

23    ONE OF THE ENUMERATED OFFENSES UNDER 3142(G)(1).  IT IS NOT A

24    CRIME OF VIOLENCE.  IT IS NOT A VIOLATION OF 18 USC 1591.  IT

25    IS NOT A FEDERAL CRIME OF TERRORISM.  IT DOES NOT INVOLVE A

1       MINOR VICTIM OR A CONTROLLED SUBSTANCE, FIREARM, EXPLOSIVE OR

2       DESTRUCTIVE DEVICE.  SO IT IS BY THE PLAIN LANGUAGE OF

3       3142(G)(1), THE NATURE AND CIRCUMSTANCES OF THIS OFFENSE,

4       MILITATE TOWARD RELEASE CONDITIONS.

5            MR. SIMPKINS IS ALSO CURRENTLY FACING A 5-YEAR

6       STATUTORY MAXIMUM.  NOW, AT SOME POINT THE GOVERNMENT IS GOING

7       TO SUPERSEDE.

8            THE COURT:  RIGHT, AND THEY ADDRESS THAT IN THEIR

9       RESPONSE.

10           MR. LEMON:  RIGHT.  THERE'S NO DISPUTE ABOUT THAT.

11      THEY'RE EITHER GOING TO SUPERSEDE WITH ANOTHER INDICTMENT OR BY

12      WAY OF PLEA AGREEMENT THEY'RE GOING TO SUPERSEDE WITH AN

13      INFORMATION, BUT REALLY WHAT THIS COMES DOWN TO IS UNDER THE

14      ADVISORY SENTENCING GUIDELINES THE GOVERNMENT SAYS THAT THEY

15      ARRIVE AT AN OFFENSE LEVEL OF 32 WITH A GUIDELINE OF 121 TO

16      151 MONTHS, BUT MY UNDERSTANDING IS THE LAST PLEA OFFER THAT

17      WAS EXTENDED TO PREVIOUS COUNSEL HAD AN ADJUSTED OFFENSE LEVEL

18      OF 27 AND A GUIDELINES RANGE OF 70 TO 87 MONTHS.

19      POTENTIALLY -- I'M NOT SAYING THE CASE WILL SETTLE FOR THAT,

20      BUT POTENTIALLY IT COULD, AND CERTAINLY THAT'S A FACTOR THAT

21      YOUR HONOR CAN CONSIDER.

22           ONE OF THE THINGS THE GOVERNMENT ARGUES IS THAT BECAUSE

23      THIS IS A FOREIGN BRIBERY SCHEME THAT WEIGHS IN FAVOR OF

24      DETENTION, AND SUPPORTING THAT ARGUMENT THEY CITE AN

25      UNPUBLISHED CASE FROM THE EASTERN DISTRICT OF LOUISIANA FROM

1   2003.  I WOULD JUST POINT OUT NOT ONLY IS IT AN UNPUBLISHED

2   CASE FROM THE EASTERN DISTRICT OF LOUISIANA, IT'S ALSO A

3   VIOLATION OF THE NINTH CIRCUIT RULES TO CITE A CASE -- AN

4   UNPUBLISHED OPINION FROM BEFORE JANUARY 1ST, 2007.  SO THERE IS

5   NO SUPPORT FOR THE GOVERNMENT'S ARGUMENT THAT SOMEHOW BECAUSE

6   THERE'S A FOREIGN CONSPIRACY OR THERE'S AN ALLEGATION THAT THE

7   CONSPIRACY IMPLICATES FOREIGN COUNTRIES THAT THAT WEIGHS IN

8   FAVOR OF DETENTION.

9        WITH RESPECT TO WEIGHT OF THE EVIDENCE, AGAIN, IT IS

10  WELL SETTLED THAT THE WEIGHT IS THE LEAST IMPORTANT FACTOR.

11  ONE THING THAT -- MAYBE I'M PUTTING TOO FINE A POINT ON THIS,

12  BUT THE ACTUAL SUBSTANTIVE BRIBERY ALLEGATIONS PRIMARILY

13  OCCURRED IN 2006 AND 2008, IF NOT EXCLUSIVELY.  THE GOVERNMENT

14  SAYS THAT SOME SUBSTANTIVE BRIBERY -- OVERT ACTS THAT COULD

15  FORM THE BASIS OF THE SUBSTANTIVE BRIBERY ALLEGATIONS OCCURRED

16  IN 2012, BUT THE EMAILS THAT SUPPORT THOSE ALLEGATIONS

17  SPECIFICALLY RELATE -- AT THIS POINT MY UNDERSTANDING IS MR.

18  SIMPKINS WAS NOT IN THE POSITION TO DO ANYTHING FOR MR. LEONARD

19  AT THAT POINT, THAT MR. SIMPKINS WAS MERELY ASKING FOR A FAVOR,

20  HE WAS ASKING FOR A JOB.  SO THESE WERE NOT -- WHAT TOOK PLACE

21  BETWEEN MR. SIMPKINS AND MR. LEONARD IN 2012 THE EMAILS, THE

22  EMAILS THAT -- THE EMAIL EXCHANGES ADDRESS A JOB FOR MR.

23  SIMPKINS AND PROSTITUTES.  THEY DON'T TALK ABOUT A QUID PRO

24  QUO, MONEY IN EXCHANGE FOR FAVORS, SO THAT WAS THE POINT I WAS

25  TRYING TO MAKE.

1          WITH RESPECT TO THE HISTORY AND CHARACTERISTICS OF MR.

2     SIMPKINS, THE FIRST THING UNDER 3142(G)(3)(A) IS HIS CHARACTER,

3     SO VERY BRIEFLY, HE IS A SOUTH CAROLINA NATIVE, WHO ALSO LIVED

4     IN PHILADELPHIA AS A TEENAGER AND YOUNG ADULT.  HE HAS

5     ABSOLUTELY NO PRIOR CRIMINAL HISTORY.  HE HAS A BACHELOR OF

6     ARTS FROM THE UNIVERSITY OF MARYLAND, AND A MASTER'S IN HUMAN

7     RESOURCES FROM THE UNIVERSITY OF OKLAHOMA.

8          HE'S BEEN HONORABLY DISCHARGED FROM THE U.S. AIR FORCE.

9     THAT WAS IN 1994, AFTER 21 YEARS OF SERVICE.  HIS DATES OF

10    SERVICE WERE FEBRUARY 8TH OF 1973 TO MARCH 31ST OF 1994.

11    DURING THAT TIME HE RECEIVED A MERITORIOUS SERVICE MEDAL.  A

12    JOINT SERVICE COMMENDATION MEDAL.  THE AIR FORCE COMMENDATION

13    MEDAL.  THE AIR FORCE GOOD CONDUCT MEDAL WITH FIVE OAK LEAF

14    CLUSTERS.  THE NCO PROFESSIONAL MILITARY EDUCATION GRADUATE

15    RIBBON WITH ONE OAK LEAF CLUSTER.  THE AIR FORCE LONGEVITY

16    SERVICE AWARD WITH FOUR OAK LEAF CLUSTERS.  THE NATIONAL

17    DEFENSE SERVICE MEDAL WITH ONE OAK LEAF CLUSTER.  THE AIR FORCE

18    OVERSEAS RIBBON ALONG WITH FOUR OAK LEAF CLUSTERS.  THE AIR

19    FORCE TRAINING RIBBON.

20          THE COURT REPORTER:  SLOW DOWN.

21          MR. LEMON:  SORRY ABOUT THAT.  THE AIR FORCE

22    OUTSTANDING UNIT AWARD WITH TWO OAK LEAF CLUSTERS.

23          AND, FURTHER, FOUR YEARS OF HIS ENLISTMENT, FROM

24    AUGUST 2ND, 1990 TO MARCH 31, 1994, WERE SERVED IN SUPPORT OF

25    OPERATION DESERT SHIELD, DESERT STORM.  SO THIS IS SOMEONE WHO

1     HAS SERVED THIS COUNTRY HONORABLY, AND HE DID SO FOR 20 YEARS.

2          WITH RESPECT TO THE SECOND FACTOR UNDER 3142(G)(3)(A),

3     HIS PHYSICAL AND MENTAL CONDITION.  HE'S 61 YEARS OLD.  HE DOES

4     SUFFER FROM CHRONIC HEPATITIS, HIGH BLOOD PRESSURE, HIGH

5     CHOLESTEROL, A HERNIATED DISK, AND HE HAS A PRECANCEROUS OR

6     CANCEROUS CYST ON HIS LIVER, WHICH IS BEING MONITORED FOR

7     POSSIBLE SURGERY.  THE GOVERNMENT SAYS, "WELL, THAT DOESN'T

8     MEAN HE'S NOT A FLIGHT RISK," AND I'M NOT SUGGESTING THAT IT

9     MAKES YOU LESS OF A FLIGHT RISK BECAUSE HE HAS SOME OF THESE

10    CONDITIONS.

11         THE REASON I MENTION IT TO THE COURT IS TO EXPLAIN WHY

12    HE WANTS TO GET OUT OF CUSTODY TO SPEND SOME TIME WITH HIS SON

13    BEFORE HE GOES BACK IN, BECAUSE HE'S CONCERNED THAT ONCE HE'S

14    SENTENCED IN THIS CASE, HE MIGHT NOT EVER SEE HIS SON AGAIN OR

15    HIS WIFE.  SO THAT'S THE BASIS FOR -- REALLY THAT'S WHY WE'RE

16    HERE IS BECAUSE HE'S CONCERNED THAT HE MIGHT NOT LIVE LONG

17    ENOUGH TO SEE HIS FAMILY ON THE OTHER SIDE OF HIS POTENTIAL

18    SENTENCE IN THIS CASE.

19         AGAIN, HIS FAMILY TIES, HE WAS LIVING IN ARLINGTON,

20    VIRGINIA FROM 2006 TO THE TIME THAT HE WAS ARRESTED IN THIS

21    CASE.  HE DID TRAVEL QUITE A BIT.  THE GOVERNMENT SAYS HE WAS

22    LIVING IN FOREIGN COUNTRIES.  HE TRAVELED EXTENSIVELY, BUT HE

23    MAINTAINED A RESIDENCE IN VIRGINIA.

24         AGAIN, HIS WIFE IS A U.S. CITIZEN, AND SHE WILL COME

25    BACK HERE IF HE'S RELEASED.  AND SIMILARLY HIS SON IS A U.S.

1 CITIZEN WHO WILL ALSO COME BACK HERE IF HE'S RELEASED.

2  WITH RESPECT TO EMPLOYMENT UNDER THIS FACTOR, AGAIN, HE

3 RETIRED IN JUNE OF 2014 AFTER 20 YEARS IN CIVIL SERVICE, SO

4 THIS IS SOMEONE WHO WAS GAINFULLY EMPLOYED FOR 40 YEARS WHEN WE

5 COMBINE HIS CIVIL SERVICE WITH HIS MILITARY SERVICE.

6  FINANCIAL RESOURCES, HE HAS PRIMARILY A GOVERNMENT

7 PENSION ACCOUNT, WHICH I THINK HE'S CONSIDERING LIQUIDATING TO

8 POST HIS COLLATERAL FOR HIS BOND.  THE GOVERNMENT ALLEGES THAT

9 HE OWES -- HE'S GOING TO HAVE TO FORFEIT AROUND $450,000.  I

10 THINK THAT NUMBER MAY ULTIMATELY BE IN DISPUTE, BUT EVEN IF WE

11 ASSUME THAT THE GOVERNMENT IS CORRECT, THAT HE'S GOING TO OWE

12 $450,000, BY MY BACK-OF-THE-ENVELOPE CALCULATIONS, HE'S ALREADY

13 HAD 150 OF THAT SEIZED, SO THEY'VE ALREADY GOT 150, AND -- FROM

14 ONE OF HIS ACCOUNTS, WHENEVER HE WAS INDICTED, AND I BELIEVE HE

15 HAS ROUGHLY AROUND 500 LEFT.  SO THIS IS MONEY OVER AND ABOVE

16 -- THE REQUESTED BOND -- THE POINT I'M TRYING TO MAKE IS THE

17 BOND AMOUNT IS MONEY THAT HE'S GOING TO WANT TO GET BACK AT THE

18 END OF THIS CASE THAT THE GOVERNMENT IS NOT GOING TO LIKELY

19 SEIZE.

20  WITH RESPECT TO THE NEXT FACTOR, WHICH IS LENGTH OF

21 RESIDENCE IN THE COMMUNITY, AGAIN, EIGHT YEARS IN THE EASTERN

22 DISTRICT OF VIRGINIA, NOT A FOREIGN RESIDENT.  WE DISPUTE THAT.

23 HE DOES HAVE FRIENDS IN VIRGINIA.  I HAVE SPOKEN TO ONE OF THEM

24 WHO HAD A SMALL PARCEL OF LAND THAT HE WAS CONSIDERING POSTING

25 AS COLLATERAL, BUT BASED ON MY CONVERSATION WITH THAT PERSON,

1       WHOSE NAME ESCAPES ME AT THE MOMENT, IT'S CHARLES SOMETHING,

2       BUT HIS WIFE WAS PRESSURING HIM NOT TO ENCUMBER ONE OF THEIR

3       ASSETS BECAUSE THEY WANTED TO GIVE IT TO ONE OF THEIR CHILDREN,

4       SO I BELIEVE THAT'S WHY THIS PERSON DID NOT ULTIMATELY END UP

5       HELPING WITH BOND.

6               THE NEXT FACTOR IS MR. SIMPKINS' PAST CONDUCT.  HE HAS

7       NO CRIMINAL HISTORY, AGAIN, ABSOLUTELY NONE.  AND I'M BEATING A

8       DEAD HORSE AT THIS POINT, BUT THE EXTENSIVE HISTORY WITH THE

9       MILITARY.

10              HISTORY RELATING TO DRUG OR ALCOHOL ABUSE, NONE

11      WHATSOEVER.  HE DRINKS MODERATELY IF AT ALL AND HAS NO HISTORY

12      OF DRUG ABUSE.

13              THE NEXT FACTOR AGAIN IS CRIMINAL HISTORY.  HE DOESN'T

14      HAVE ANY.

15              THE NEXT FACTOR IS THE RECORD CONCERNING APPEARANCE AT

16      COURT HEARINGS.  HE HAS NO HISTORY OF FAILING TO APPEAR OR ANY

17      HISTORY OF NONAPPEARANCE.

18              THE 3142(G)(B), IT'S AN ENTIRE SUBSECTION UNDER

19      3142(G)(3), WHICH IS WHETHER AT THE TIME OF THE CURRENT OFFENSE

20      HE WAS ON PROBATION OR PAROLE.  OBVIOUSLY, AGAIN, HE'S NOT, SO

21      THAT'S ANOTHER SIGNIFICANT FACTOR THAT MILITATES TOWARDS

22      CONDITIONS OF RELEASE.

23              SO AGAIN, THE MAIN REASON HE WANTS TO BAIL OUT IS

24      BECAUSE HE WANTS TO SPEND SOME TIME WITH HIS WIFE AND CHILD.

25              SECONDARILY, HE WOULD ALSO LIKE THE OPPORTUNITY TO

1    REPORT DIRECTLY TO HIS DESIGNATED INSTITUTION RATHER THAN BE

2    TRANSPORTED IN CUSTODY, WHICH MY UNDERSTANDING IS A SIGNIFICANT

3    HARDSHIP PARTICULARLY FOR PEOPLE WHO ARE OLD AND HAVE SOME

4    HEALTH ISSUES WITH HIS BACK.

5         MY UNDERSTANDING, NOT JUST FROM MR. SIMPKINS BUT

6    THROUGHOUT REPRESENTING A LOT OF PEOPLE THAT HAVE BEEN

7    TRANSPORTED AROUND THE UNITED STATES WITH THE BOP, IS THAT THEY

8    SPEND LONG, LONG HOURS ON BUSSES, AND IN AIRPLANES WITH THEIR

9    HANDS CUFFED, AND IT'S EXTREMELY UNCOMFORTABLE, SO THAT'S

10   SOMETHING THAT HE WOULD LIKE TO AVOID IF POSSIBLE.

11        AND THEN FINALLY, IN THE EVENT THAT THIS CASE DOES IN

12   FACT RESOLVE BY WAY OF A PLEA AGREEMENT, HE WOULD LIKE TO

13   DEMONSTRATE TO THE COURT POST-OFFENSE REHABILITATION, WHICH IS

14   SOMETHING THAT OBVIOUSLY HE'S GOING TO BE ABLE TO DO MORE IF

15   HE'S ON BOND THAN IF HE'S IN CUSTODY.

16        SO AGAIN, I'M PROPOSING $150,000 CORPORATE SURETY BOND,

17   SECURED BY FUNDS THAT ARE CURRENTLY IN HIS GOVERNMENT PENSION

18   ACCOUNT.  AGAIN, I SPOKE WITH THE BAIL BONDSMAN TODAY WHO

19   REPRESENTS THAT HE WOULD BE WILLING TO MAKE THAT HAPPEN AND

20   WOULD PARTICIPATE IN AN EXAMINATION OF SURETIES.  HIS TRAVEL

21   COULD CERTAINLY BE RESTRICTED TO THIS DISTRICT, AS WELL AS SOME

22   FORM OF ELECTRONIC MONITORING.

23        I WOULD POINT OUT THAT THE PRETRIAL SERVICES REPORT

24   FROM THE EASTERN DISTRICT OF VIRGINIA ACTUALLY REQUESTED A

25   $20,000 BOND SECURED BY REAL PROPERTY.  I CERTAINLY THINK WHAT

1    I'M REQUESTING IS WELL WITHIN THE BOUNDS OF REASON.

2         ONE OF THE THINGS THAT -- WELL, I'LL SUBMIT ON THAT AT

3    THIS POINT, YOUR HONOR.  THANK YOU.

4         THE COURT:  THANK YOU.

5         MR. PLETCHER.

6         MR. PLETCHER:  THANK YOU, YOUR HONOR.  YOUR HONOR, THE

7    MAGISTRATE JUDGE IN THE EASTERN DISTRICT OF VIRGINIA FOUND,

8    AFTER HEARING ARGUMENT AND CONSIDERING THE RECORD, THAT THE

9    DEFENDANT WAS A FLIGHT RISK.  NOTHING'S CHANGED, AND, IN FACT,

10   THE CIRCUMSTANCES HAVE GOTTEN SIGNIFICANTLY WORSE FOR MR.

11   SIMPKINS.

12        MR. LEMON POINTED OUT THAT IT IS THE CATEGORICAL

13   PRESUMPTION CASE AND HE STATED THAT THAT MILITATES IN FAVOR OF

14   RELEASE.  THAT'S NOT RIGHT.  WHAT IT DOES IS IT MEANS IT'S NOT

15   A PRESUMPTION CASE, WHICH MEANS WE STARTED AT REPOSE.  IT'S NOT

16   A FACTOR THAT MILITATES IN FAVOR OF RELEASE.  IT'S SIMPLY THAT

17   THE GOVERNMENT HAS TO PROVE BY A PREPONDERANCE THAT MR.

18   SIMPKINS IS A FLIGHT RISK.

19        A CAREFUL ANALYSIS, EVEN A RUDIMENTARY ANALYSIS OF EACH

20   ONE OF THE FACTORS, SHOWS THAT MR. SIMPKINS IS A FLIGHT RISK.

21   IN FACT, A FLIGHT RISK PERHAPS SPECIALLY SITUATED AMONG ALL OF

22   THE WHITE COLLAR DEFENDANTS THAT WE SEE.

23        THE NATURE AND CIRCUMSTANCES OF THE OFFENSE ARE LAID

24   OUT IN THE INDICTMENT, AND I DON'T WANT TO BELABOR THOSE,

25   EXCEPT TO NOTE A COUPLE OF POINTS.  ONE IS THAT THE ACCUSATION

1    IS THAT HE RECEIVED APPROXIMATELY $450,000 IN BRIBES IN RETURN

2    FOR OFFICIAL ACTS FAVORING GMA AND LEONARD FRANCIS.  THAT

3    $450,000 NUMBER IS SUPPORTED BY AT LEAST $250,000 IN WIRE

4    TRANSFERS TO HIS THEN WIFE'S ACCOUNT IN JAPAN, FROM WHICH HE

5    THEN TRANSFERRED MONEY DIRECTLY BACK TO HIS OWN ACCOUNT IN A

6    WAY THAT WAS MEANT TO CONCEAL, OBSCURE THE SOURCE OF THOSE

7    FUNDS.

8         HE IS RIGHT NOW CHARGED WITH ONE COUNT OF 371.  IN

9    CONVERSATIONS WITH PREVIOUS COUNSEL, AND CONVERSATIONS WITH MR.

10   LEMON, THEY HAVE BEEN APPRISED OF OUR INTENTION TO SUPERSEDE

11   THAT INDICTMENT IF A RESOLUTION WAS NOT REACHED IN THIS CASE.

12   ON TWO SEPARATE OCCASIONS WE HAVE AGREED TO PUSH OFF THAT

13   SUPERSEDING INDICTMENT DATE, FIRST TO ALLOW PREVIOUS COUNSEL TO

14   REVIEW DISCOVERY, AND THEN UPON THE CHANGE OF COUNSEL TO MR.

15   LEMON.  SO THE ARGUMENT NOW THAT SOMEHOW THE FACT THAT HE'S

16   ONLY BEEN CHARGED WITH ONE COUNT SHOULD COUNT IN HIS FAVOR WITH

17   RESPECT TO DETENTION PUTS OUR GOODWILL IN JEOPARDY.

18        WE HAVE MADE ACCOMODATION FOR THIS DEFENDANT TO

19   CONSIDER THE CHARGES, TO REVIEW THINGS, AND SO HE'S NOT NOW

20   CHARGED WITH MULTIPLE COUNTS OF SUBSTANTIVE BRIBERY.  HE'S NOT

21   NOW CHARGED WITH MONEY LAUNDERING UPWARDS OF $250,000.  EACH OF

22   THOSE THINGS WOULD RAISE NOT ONLY HIS ADVISORY GUIDELINE RANGE,

23   BUT HIS STATUTORY MAXIMUM SENTENCE INTO THE 20 FOR MONEY

24   LAUNDERING, 15 YEARS FOR SUBSTANTIVE BRIBERY, 5 YEARS FOR

25   CONSPIRACY COUNTS.  SO HE WOULD BE LOOKING AT A 40-YEAR

1    STATUTORY MAXIMUM IF THE UNITED STATES HAD DELIVERED ON ITS

2    PROMISES, WITHOUT GRANTING THE ACCOMMODATIONS REQUESTED BY THIS

3    DEFENDANT.

4         THE WEIGHT OF THE EVIDENCE IS, AS EVERYONE ROUTINELY

5    POINTS OUT, THE LEAST IMPORTANT FACTOR THOUGH, THE LIKELIHOOD

6    OF CONVICTION IS SOMETHING THE COURT MUST WEIGH BECAUSE IT

7    WEIGHS ON THE DEFENDANT MAYBE ALMOST PRECISELY, MAY BE THE MOST

8    IMPORTANT FACTOR FOR A DEFENDANT CONSIDERING WHETHER TO FLEE.

9         IN THIS CASE, WE'VE GOT TESTIMONY FROM PEOPLE WHO ARE

10   INVOLVED IN THE EVENTS.  YOU'VE GOT DOCUMENTS, SOME OF WHICH WE

11   SUBMITTED, I'M SURE THE COURT HAS REVIEWED, SHOWING THE

12   MONETARY TRANSFERS, FIRST TO THE SHILL ACCOUNT IN JAPAN.  WE'VE

13   RECEIVED RECORDS FROM THE GOVERNMENT OF JAPAN SHOWING THOSE

14   TRANSACTIONS.  WE HAVE THE MONETARY TRANSFERS BACK TO MR.

15   SIMPKINS' ACCOUNT IN THE UNITED STATES.  WE HAVE A REFLECTION

16   OF THE CONTRACT ACTIONS AND THE OTHER OFFICIAL ACTS THAT MR.

17   SIMPKINS WAS TAKING OR TELLING MR. FRANCIS THAT HE WAS TAKING

18   ON HIS BEHALF, AND WE HAVE TESTIMONY OF PEOPLE INVOLVED IN THE

19   EVENT.  WE ALSO HAVE THE STATEMENT FROM MR. SIMPKINS WHICH ON

20   ITS FACE, BASED ON MY READING, EFFECTIVELY ADMITS ALL OF THE

21   ELEMENTS OF RECEIVING A BRIBE FROM A DEFENSE CONTRACTOR,

22   WHETHER IT WAS TO HIM DIRECTLY OR THROUGH HIS THEN WIFE.

23        THE WEIGHT OF THE TESTIMONY THOUGH, YOUR HONOR, AND

24   WHILE IT MAY BE THE LEAST IMPORTANT FACTOR, I THINK IN THIS

25   CASE A NON-ENUMERATED FACTOR THAT FITS WITHIN THIS RUBRIC IS

1    ALSO THE ONE THAT THE COURT SHOULD CONSIDER, AND THAT'S THE

2    NATURE OF THE EVIDENCE, NOT THE WEIGHT BUT THE NATURE.

3         IN THIS CASE THERE'S GOING TO BE EVIDENCE THAT'S OF A

4    VERY EMBARRASSING AND PERSONAL NATURE.  AS WE'VE DESCRIBED

5    PREVIOUSLY, AND THE COURT READ THE TRANSCRIPT BEFORE, THERE'S

6    QUITE A BIT OF TALK THROUGHOUT THIS ABOUT THE PROVISION OF

7    PROSTITUTES AND OTHER WOMEN FOR SEXUAL FAVORS IN RETURN FOR

8    MONEY.  THE EMAILS SPEAK ABOUT CLEAN, DISEASE-FREE WOMEN.

9         THERE'S ALSO THE ASPECT THAT WHILE HIS WIFE WAS

10   RECEIVING MONEY IN JAPAN, HE WAS CONSORTING WITH A NUMBER OF

11   OTHER PEOPLE, INCLUDING HIS NOW WIFE, WHO WAS HIS THEN

12   MISTRESS.  ALL OF THIS IS INCREDIBLY EMBARRASSING, PERSONALLY

13   DIFFICULT TESTIMONY WHICH SUGGESTS AN UNLIKELIHOOD THAT A

14   DEFENDANT WOULD WANT THOSE THINGS PUBLICLY AIRED IN A TRIAL,

15   AND THEY CREATE -- NOT JUST WITH RESPECT TO THE WEIGHT OF THE

16   EVIDENCE, BUT THE NATURE OF THE EVIDENCE CREATES AN INDEPENDENT

17   REASON TO FLEE.

18        THE HISTORY AND THE CHARACTERISTICS OF THE DEFENDANT,

19   SIMILARLY DO HIM NO FAVORS, AND WE TAKE NOTHING AWAY FROM HIS

20   AIR FORCE SERVICE, BUT SINCE THAT TIME THIS DEFENDANT HAS

21   ESSENTIALLY NO TIES TO THE UNITED STATES.  IN THE DEFENDANT'S

22   MOVING PAPERS, THEY TALK ABOUT NO TIES TO SAN DIEGO AND THAT

23   CAN'T BE HIS FAULT.  THE UNITED STATES DOESN'T RELY ON HIS LACK

24   OF TIES TO SAN DIEGO AND APPRECIATES THAT HE CAN'T CHOOSE IN

25   THIS CASE WHERE HE WAS CHARGED, BUT THIS DEFENDANT HAS NO TIES

1    TO THE UNITED STATES.

2         TAKING A STEP BACK TO THE DAY HE WAS ARRESTED, THE

3    DEFENDANT HAD BEEN OUT OF THE COUNTRY FOR SIX MONTHS.  IN THE

4    PREVIOUS SEVEN YEARS HE HAD BEEN TO JAPAN 18 TIMES, SOUTH KOREA

5    FOUR TIMES, SPAIN THREE TIMES, HONG KONG AT LEAST ONCE.

6         HE CONSTANTLY IS OUT OF THE UNITED STATES, AND EVINCED

7    AN INTEREST IN NOT LIVING IN THE UNITED STATES.  IN FACT, THE

8    DAY BEFORE HIS ARREST, HIS HOUSE WAS UP FOR SALE, THEREBY,

9    ATTEMPTING TO SEVER THE VERY LAST TIE HE HAD WITH THE UNITED

10   STATES, WHICH WAS AT THE TIME AN UNDERWATER TOWNHOUSE IN

11   HAYMARKET, VIRGINIA.  TO CALL HIM A RESIDENT OF VIRGINIA SINCE

12   2007 STRAINS THE DEFINITION OF RESIDENT TO ITS VERY BREAKING

13   POINT.

14        HIS EDUCATION AND RESOURCES ARE FACTORS THAT COUNT

15   AGAINST HIM.  HE HAS THE EXPERIENCE AND THE KNOW-HOW TO LIVE

16   COMFORTABLY ABROAD.  HE HAS MONEY IN THESE VARIOUS ACCOUNTS.

17   HE'S RECEIVING $4,000 A MONTH STILL TO THIS MOMENT BY THE AIR

18   FORCE.  HE HAS, MOST IMPORTANTLY, A SUPPORT STRUCTURE -- TWO

19   FAMILY STRUCTURES AND A PROFESSIONAL STRUCTURE THAT HE ALREADY

20   IS USING ABROAD.

21        TO BE CLEAR, HIS WIFE IS NOT HERE TODAY TO EVINCE HER

22   SUPPORT FOR HIS RELEASE.  NO CHILDREN ARE HERE TODAY TO EVINCE

23   THEIR SUPPORT.  THERE IS NOTHING IN THE RECORD THAT SUGGESTS

24   THAT THEY'RE COMING BACK, JUST THE HYPOTHETICAL POSSIBILITY

25   THAT THEY MIGHT, AND AS I READ THE DEFENDANT'S MOVING PAPERS,

1          IT WAS PHRASED WITH A FAVORABLE INTENTION AND NOT A CERTITUDE.

2                 IN ANY EVENT, HIS WIFE HAS -- WHILE SHE MAY BE A

3          NATURALIZED U.S. CITIZEN, SHE REMAINS A CITIZEN OF CHINA.  SHE

4          CAN LIVE THERE FOREVER, WHERE SHE'S LIVING NOW AND HAS BEEN

5          TAKING CARE OF HER MOTHER IN SHANGHAI.

6                 THE DEFENDANT HAS A SEPARATE FAMILY STRUCTURE IN

7          THAILAND WHERE HE HAS A CHILD BY ANOTHER WOMAN, A 1-YEAR-OLD

8          SON, AND TRAVELING BETWEEN THAILAND AND CHINA TO VISIT THESE

9          TWO FAMILY UNITS IS NOT A STRETCH.  IN FACT, IT'S MUCH MORE

10         LIKELY THAT THAT IS THE OUTCOME HERE THAN HAVING THESE PEOPLE

11         COME BACK TO THE UNITED STATES TO SPEND TIME WITH HIM IN AN

12         EXTENDED STAY AMERICA.

13                AS PRETRIAL SERVICES RECOUNTED FROM THE EASTERN

14         DISTRICT OF VIRGINIA, HE ALSO HAD DEVELOPED PROFESSIONAL TIES

15         ABROAD.  WE KNOW PREVIOUSLY HE APPLIED FOR JOBS WITH THE U.S.

16         MILITARY ABROAD.  HE APPLIED FOR A JOB WITH THE AMERICAN

17         CHAMBER OF COMMERCE IN BANGKOK.  HE DESCRIBED THAT HE WAS

18         WORKING WITH A CLIENT CALLED GRS, THAT WAS DESCRIBED AS A

19         FOREIGN ENTITY.  NO REASON TO THINK THAT ANY OF THESE FOREIGN

20         ENTITIES WOULD FOR SOME REASON OR ANOTHER REFUSE TO CONTINUE TO

21         EMPLOY MR. SIMPKINS IF HE WAS TO FLEE, AS IF WE WOULD EVEN

22         KNOW.

23                ULTIMATELY, YOUR HONOR, THOSE CIRCUMSTANCES ARE THE

24         MOST PREVALENT HERE, THE DEMONSTRABLE FAILURE TO HAVE ANY TIES

25         TO THE UNITED STATES ARE THE SINGLE MOST REASON THAT MR.

1    SIMPKINS IS A FLIGHT RISK.

2         I MENTIONED A COUPLE OF OTHER THINGS, HIS HEALTH

3    PROBLEMS, I THINK ARE AN ADDITIONAL REASON TO FLEE.  HE HAS NO

4    INTEREST IN BEING HERE AND WAITING OUT A TRIAL, WHETHER IN AN

5    EXTENDED STAY AMERICA OR INCARCERATED.  HIS HEALTH PROBLEMS

6    SUGGEST THAT MAKING A BREAK FOR IT THROUGH TIJUANA, AND GOING

7    HOWEVER HE WOULD GO FROM THERE, WOULD BE WORTH THE RISK.  IT'S

8    MUCH EASIER TO LIVE IN THESE FOREIGN COUNTRIES SURROUNDED BY

9    FAMILY, PLACES WHERE HE'S PRIMARILY LIVED SINCE 2007, WITH

10   THESE HEALTH PROBLEMS.  THESE HEALTH PROBLEMS ALSO ARE NOT THE

11   TYPE THAT ARE ONLY TREATABLE IN THE UNITED STATES.  IN FACT,

12   MOST OF THEM SEEM LIKE VERY MANAGEABLE CONDITIONS THAT

13   HOSPITALS ARE ROUTINELY USED TO TREATING ABROAD.

14        THE PROPOSAL THAT HE POST A $150,000 BOND, AND SOMEHOW

15   THAT THAT'S AN APPROPRIATE DETERRENT, DOESN'T EVEN COME CLOSE

16   TO THE COST OF DOING BUSINESS.  HE'S ALLEGED WITH TAKING

17   $450,000 IN BRIBES.  THAT'S THE BRIBE AMOUNT RECEIVED.  THAT

18   DOESN'T ACCOUNT FOR THE LOSS TO THE UNITED STATES.  THAT

19   DOESN'T ACCOUNT FOR THE GAIN TO THE DEFENSE CONTRACTOR, AND

20   AFTER TRIAL THOSE ARE METRICS THAT THE COURT COULD ALSO USE TO

21   IMPOSE RESTITUTION AND FORFEITURE.  THAT'S JUST THE BEAR

22   MINIMUM.

23        THE UNITED STATES HAS SEIZED SOME MONEY THAT WAS

24   DIRECTLY TRACEABLE AS PROCEEDS OF THIS CRIMINAL ACTIVITY,

25   APPROXIMATELY $150,000.  IF HE WERE TO PUT UP $150,000, HE

1    WOULD STILL BE $150,000 IN THE BLACK JUST AS TO THE MONEY

2    RECEIVED, BUT FOR THE UNITED STATES IT ISN'T A QUESTION OF

3    MONEY.  IT ISN'T A QUESTION OF HOW MUCH MONEY, BECAUSE GIVEN

4    THESE PARTICULAR CIRCUMSTANCES, GIVEN SOMEONE WITH SUCH A

5    LITTLE CHANCE OF PREVAILING IN COURT, AND SUCH FLEETING OR

6    NONEXISTENT TIES TO THE UNITED STATES, THERE ARE NO CONDITIONS

7    HERE, YOUR HONOR, THAT WOULD REASONABLY ASSURE HIS APPEARANCE

8    AT SUBSEQUENT PROCEEDINGS.

9        LASTLY, YOUR HONOR, SOMETIMES WE HEAR ABOUT IN CASES,

10   ESPECIALLY WHITE COLLAR CASES, ABOUT DEFENDANTS WHO DON'T FLEE

11   OR WE DON'T REALLY SEE FLIGHT IN THIS DISTRICT, AND I'M NOT

12   SURE THAT ALL OF THOSE DATA POINTS ARE ALWAYS BEFORE THE COURT,

13   AND SO THERE ARE TWO VERY RECENT CASES IN -- WHITE COLLAR

14   CASES, ONE WAS A HEALTH CARE FRAUD CASE.  IT WAS ACTUALLY AN

15   OUT OF DISTRICT CASE OF THE SOUTHERN DISTRICT OF TEXAS WHERE

16   THE DEFENDANT WAS ARRESTED HERE IN SAN DIEGO, MADE HIS INITIAL

17   APPEARANCE, ORDERED TO THE SOUTHERN DISTRICT OF TEXAS, AND ON

18   ROUTE FLED AND HASN'T BEEN SEEN SINCE.

19       THE SECOND CASE IS IN CASE NUMBER 14-CR-3326 IN FRONT

20   OF JUDGE BASHANT.  IN THAT CASE THE DEFENDANT, MOHAMED DAOUD,

21   HAD ENTERED A GUILTY PLEA FOR SOME TIME AND WAS SET TO BE

22   SENTENCED INTO THE FUTURE, ON 12/21, FOUR DAYS BEFORE

23   CHRISTMAS, AFTER SPENDING A YEAR ON PRETRIAL RELEASE, WITH

24   VIRTUALLY NO PROBLEMS, DROVE TO TIJUANA, CAUGHT A FLIGHT TO

25   AMAN, JORDAN, AND THERE HE RESIDES, AND YOU CAN FOLLOW HIM ON

1    FACEBOOK.

2            SO THE IDEA THAT THESE -- THAT THERE IS NO INCENTIVE OR

3    NO POSSIBILITY TO FLEE WITHOUT A PASSPORT IS AN ABSOLUTE RED

4    HERRING AND MISNOMER FOR PEOPLE WITH MEANS AND KNOW-HOW,

5    PARTICULARLY THAT GAINED OVER YEARS OF PROFESSIONAL EXPERIENCE

6    CULTIVATING TIES AROUND THE WORLD.  THESE ARE THINGS THAT ARE

7    WITHIN ANY -- AS THESE TWO CASES SHOW, WITHIN ANY DEFENDANT'S

8    ABILITY.  WITH THIS DEFENDANT IN PARTICULAR, HIS HISTORY AND

9    CHARACTERISTICS, COUPLED WITH THE CIRCUMSTANCES SURROUNDING

10   THIS CASE, MAKE HIS FLIGHT ALL TOO LIKELY.  THANK YOU.

11           THE COURT:  LET ME ASK PRETRIAL IF THEY WOULD LIKE TO

12   SAY ANYTHING.  WE ALL HAVE THE BENEFIT OF SEEING THEIR REPORT.

13   IS THERE ANYTHING THAT YOU WOULD LIKE TO ADD?  STATE YOUR NAME

14   FOR THE RECORD, PLEASE.

15           THE PRETRIAL SERVICES OFFICER:  YOUR HONOR, EVELYN

16   CASERTA ON BEHALF OF PRETRIAL SERVICES.  I JUST WANT TO CLARIFY

17   THE BAIL REPORT WAS WRITTEN BY THE EASTERN DISTRICT OF

18   VIRGINIA.  AT THAT TIME THEY RECOMMENDED DETENTION BASED ON THE

19   LACK OF INFORMATION.  SINCE THAT TIME, OUR OFFICE HERE HAS

20   MAINTAINED CONTACT WITH THE DEFENDANT'S WIFE, AND THE OFFICER

21   ASSIGNED TO THE CASE DOES BELIEVE THERE IS REASONABLE BAIL THAT

22   CAN BE SET.  IF THE COURT IS INCLINED TO SET BAIL, IN REGARDS

23   TO CONDITIONS OF RELEASE, I KNOW DEFENSE COUNSEL PROPOSED

24   ELECTRONIC MONITORING.  THAT CONDITION IS NOT RECOMMENDED IN

25   THE PRETRIAL SERVICES REPORT.  I WILL NOTE THIS IS NOT A SEX

1    OFFENSE CASE AND WOULD NOT RECOMMEND THE GPS CONDITION.  THANK

2    YOU, YOUR HONOR.

3         THE COURT:  GO AHEAD, MR. LEMON.

4         MR. LEMON:  I'LL START THERE AND CLARIFY THAT.  I

5    MISREAD THE SECOND PAGE OF THE PRETRIAL SERVICES REPORT.  I

6    THOUGHT THAT THAT RECOMMENDATION WAS COMING FROM THE EASTERN

7    DISTRICT OF VIRGINIA, APPARENTLY IT'S FROM THIS OFFICE WHICH IS

8    FOR A $20,000 PROPERTY BOND.  AGAIN WHAT I'M RECOMMENDING IS

9    MUCH MORE ONEROUS THAN THAT.

10        I WOULD LIKE TO START WITH COUNSEL'S READING OF

11   3142(G)1 SAYING THAT BECAUSE THIS IS NOT AN ENUMERATED OFFENSE

12   THAT THAT DOESN'T MILITATE IN FAVOR OF BOND.  FRANKLY, I

13   DISAGREE WITH COUNSEL'S READING OF THAT.  WHAT I BELIEVE HE

14   ARGUED IS THAT THOSE ENUMERATED OFFENSES TRIGGER A PRESUMPTION,

15   BUT THE PRESUMPTION IS THE OFFENSES ARE ENUMERATED AT 3142 F1.

16   SO WHAT'S ENUMERATED AT 3142(G)1 IS JUST OFFENSES THAT IF THIS

17   OFFENSE WAS ONE OF THEM THAT WAS LISTED THAT WOULD BE SOMETHING

18   THAT THE COURT WOULD TAKE INTO ACCOUNT AS SOMETHING WEIGHING

19   THIS FAVOR OF NOT SETTING CONDITIONS OF RELEASE.  SO I DON'T

20   BELIEVE THAT THAT'S A FACTOR.  I BELIEVE IT'S A FACTOR IN MR.

21   SIMPKINS'S FAVOR.

22        THE NEXT POINT THAT COUNSEL MADE THAT I WANTED TO

23   ADDRESS WAS WITH RESPECT TO THE FINDINGS OF THE MAGISTRATE

24   JUDGE IN VIRGINIA.  THAT'S ENTITLED TO NO DEFERENCE WHATSOEVER

25   TO YOUR HONOR.

1      THE COURT:  I UNDERSTAND.

2      MR. LEMON:  THE VERY EMBARRASSING AND PERSONAL NATURE

3  OF SOME OF THE EVIDENCE THAT MIGHT COME TO LIGHT IF THIS GOES

4  TO TRIAL -- AND FRANKLY I DON'T THINK THIS IS GOING TO TRIAL,

5  IT MIGHT, BUT I SUSPECT NOT -- IT'S KIND OF BESIDE THE POINT.

6  THERE IS NO OZZIE AND HARRIET LIFESTYLE REQUIREMENTS FOR

7  GETTING RELEASE CONDITIONS.  THIS COURT IS REQUIRED TO CONSIDER

8  WHETHER ANY CONDITIONS CAN BE SET.  IF THE COURT FINDS THAT

9  APPROPRIATE CONDITIONS CAN BE SET, THEN IT SHOULD SET THE

10  CONDITIONS, REGARDLESS OF HOW MR. SIMPKINS HAS LIVED HIS LIFE

11  TO THIS POINT.  YOU KNOW, HE HAS A WIFE WHO IS DECEASED, AND HE

12  REMARRIED, AND HE HAS A CHILD THROUGH A SURROGATE MOTHER.  THAT

13  IS PERHAPS NOT TYPICAL, BUT THAT'S NOT A REASON TO HOLD HIM

14  WITHOUT BAIL.

15      WITH RESPECT TO COUNSEL'S ARGUMENT THAT HE HAS NO TIES

16  TO THE UNITED STATES AND EXTENSIVE TRAVEL; FIRST OF ALL, MR.

17  SIMPKINS INFORMS ME THAT, MUCH LIKE THREE DOG NIGHT, HE'S NEVER

18  BEEN TO SPAIN, SO I THINK COUNSEL'S PROFFER ON THAT POINT WAS

19  INACCURATE.

20      THE SALIENT POINT HERE IS THAT IF WE TAKE OUT THE

21  ALLEGED BRIBERY FROM MR. SIMPKINS'S ACTIVITIES WHILE HE WAS

22  WORKING AS A CIVILIAN CONTRACT SERVICES PERSON, THERE'S NOTHING

23  WRONG WITH HIM WORKING ABROAD AND HAVING FOREIGN CONTACTS, THAT

24  WAS THE NATURE OF HIS BUSINESS.  SO AGAIN, HIS WORK --

25  LEGITIMATE WORK TOOK HIM OUTSIDE THE UNITED STATES.  THAT'S NOT

1     A BASIS TO HOLD HIM WITHOUT BOND.

2           THE NEXT POINT WAS THAT THERE'S NOTHING IN THE RECORD

3     TO SAY THAT HIS WIFE AND HIS SON WILL COME BACK TO THE UNITED

4     STATES TO BE WITH HIM IF HE POSTS BOND, BUT I DISAGREE WITH

5     THAT.  THERE IS MY PROFFER THAT I'VE SPOKEN TO HIS WIFE.  I

6     CORRESPOND WITH HER REGULARLY, AS APPARENTLY PRETRIAL SERVICES

7     DOES AS WELL, AND SHE HAS STATED THAT SHE WILL COME BACK HERE

8     IF MR. SIMPKINS IS RELEASED BECAUSE SHE WANTS TO BE WITH HER

9     HUSBAND.

10          WITH RESPECT TO HIS SON, MR. SIMPKINS INFORMS ME THAT

11    HIS SON WOULD COME BACK HERE TO BE WITH HIM IF HE'S RELEASED.

12    THAT'S THE WHOLE POINT OF THIS HEARING.

13          THE NEXT THING WAS HEALTH PROBLEMS.  COUNSEL SAYS THAT

14    HIS HEALTH PROBLEMS ARE AN ADDITIONAL REASON TO FLEE.  I THINK

15    THAT'S JUST REALLY A STRETCH.  MR. SIMPKINS HAS SOME

16    SIGNIFICANT HEALTH ISSUES.  MOST CONCERNING IS THE CYST ON HIS

17    LIVER.  I DON'T THINK ANYBODY REALLY WANTS TO BE IN THIRD WORLD

18    COUNTRIES AS A FUGITIVE LOOKING FOR MEDICAL CARE UNDER THOSE

19    CIRCUMSTANCES.  I THINK IT MAKES A LOT MORE SENSE HE WOULD WANT

20    TO BE HERE IN THE UNITED STATES, WHERE HE PROBABLY ALREADY

21    QUALIFIES FOR MEDICARE, SO HE CAN HAVE THAT TREATMENT MONITORED

22    REGULARLY.

23          AND THEN FINALLY THIS ARGUMENT THAT BECAUSE OTHER

24    DEFENDANTS HAVE FLED, YOUR HONOR SHOULD HOLD MR. SIMPKINS

25    WITHOUT BAIL.  I MEAN, I DON'T THINK THE FACT THAT MOHAMED

```
 1      DAOUD -- I DON'T KNOW WHAT THAT HAS TO DO WITH MR. SIMPKINS.

 2      CERTAINLY THE FACT THAT SOMEBODY ELSE IN SOME OTHER CASE TOOK

 3      OFF DOESN'T MEAN THAT MR. SIMPKINS SHOULD BE DETAINED.  SO WITH

 4      THAT, YOUR HONOR, I'LL SUBMIT IT.  THANK YOU.

 5          THE COURT:  I WANT TO TAKE A BRIEF FIVE-MINUTE BREAK.

 6      I'LL COME BACK AND GIVE YOU MY DECISION.  THANK YOU.

 7      (COURT WAS AT RECESS.)

 8          THE COURT:  I THINK THAT THERE IS A COMBINATION OF

 9      CONDITIONS THAT WOULD ASSURE THE APPEARANCE OF MR. SIMPKINS.

10      THESE ARE THE CONDITIONS:

11          NUMBER ONE, A $350,000 CORPORATE SURETY BOND.

12          NUMBER TWO, HE'S NOT TO LEAVE OR TRAVEL OUTSIDE THE

13      SOUTHERN DISTRICT OF CALIFORNIA.

14          NUMBER THREE, HE WILL HAVE ELECTRONIC MONITORING AT ALL

15      TIMES.

16          NUMBER FOUR, HE WILL SURRENDER HIS PASSPORT.

17          NUMBER FIVE, HIS WIFE AND SURROGATE THE MOTHER AND

18      CHILD WILL BE HERE PRIOR TO HIS RELEASE AND WILL HAVE

19      SURRENDERED ALL OF THEIR PASSPORTS.  BECAUSE, AS I UNDERSTAND

20      IT, THAT IS THE MOTIVATION FOR WANTING TO STAY HERE AND BE HERE

21      AND GET OUT OF CUSTODY, AND THAT'S A VERY SIGNIFICANT FACTOR.

22      THEY ARE, IN FACT, NOT HERE.  THEY ARE, IN FACT -- I'VE NOT

23      BEEN PRESENTED WITH ANYTHING MORE SPECIFIC, SO I'M MAKING THAT

24      A CONDITION, AND I THINK THOSE CONDITIONS WOULD ASSURE HIS

25      APPEARANCE AT FUTURE HEARINGS, AND I'M WILLING TO MAKE THOSE
```

1     CONDITIONS.

2          MR. LEMON:  YOUR HONOR, THE ONLY ISSUE WITH RESPECT TO

3     THE SURROGATE MOTHER IS I DON'T THINK SHE CAN TRAVEL TO THE

4     UNITED STATES, SO HE'S JUST GOING TO HAVE TO HAVE SOMEONE

5     TRANSPORT THE CHILD HERE.

6          THE COURT:  HOW ABOUT HIS WIFE?  WELL, I DON'T KNOW.

7     I'M NOT GOING TO GET INTO THAT.  I MEAN, YOU REPRESENTED THAT

8     SHE WAS A SURROGATE MOTHER.  I DIDN'T KNOW WHAT THE

9     ARRANGEMENTS WERE.  SO YOU CAN LOOK INTO THAT AND LET THE COURT

10    KNOW, BUT MY POINT IS THOSE PEOPLE WHO CONSTITUTE THE FAMILY

11    NEED TO BE HERE AND HAVE SURRENDERED THEIR PASSPORTS.

12         MR. PLETCHER:  I DON'T UNDERSTAND THE TERM "SURROGATE"

13    MOTHER, SO IT'S HARD FOR THE UNITED STATES TO TAKE A -- TO

14    UNDERSTAND WHAT'S BEING SAID THERE.  MY HOPE WOULD BE THAT TO

15    THE EXTENT SHE'S THE MOTHER OF THE CHILD THAT SHE WOULD BE HERE

16    AS WELL.

17         THE COURT:  WELL, I THINK WE NEED TO KNOW, AND IT

18    HASN'T BEEN PRESENTED HERE TODAY, WHO HAS LEGAL CUSTODY OF THIS

19    CHILD SO THAT NOTHING -- NO LAWS, EITHER IN THIS COUNTRY OR

20    INTERNATIONALLY, ARE VIOLATED.  I THINK SOME TERMS HAVE BEEN

21    USED A LITTLE BIT LOOSELY HERE.  THIS MAY BE HIS BIOLOGICAL

22    CHILD TO WHOM HE HAS NO LEGAL RIGHTS UNLESS THEY'VE BEEN

23    DETERMINED BY A COURT OF LAW IN SOME COUNTRY.  SO A LOT HAS

24    BEEN SAID THIS MORNING, BUT I THINK WE NEED TO LOOK AT THIS A

25    LITTLE BIT.

```
1          (DISCUSSION HELD OFF THE RECORD.)

2               MR. PLETCHER:  YOUR HONOR, WITH RESPECT TO THE GPS

3      MONITORING, THE GOVERNMENT WOULD ALSO ASK FOR GPS WITH CURFEW

4      SO THAT THE GPS MONITOR IDENTIFIES HIM AT A PARTICULAR LOCATION

5      DURING PARTICULAR HOURS.  I WOULD SUGGEST A CURFEW AT 7:00 A.M.

6      AND 5:00 P.M.

7               THE COURT:  I DON'T THINK THAT'S INAPPROPRIATE AT THIS

8      TIME.  I WILL GO WITH THE GPS CURFEW FROM 7 TO 5, IS THAT WHAT

9      YOU SUGGESTED?

10              MR. PLETCHER:  THAT'S WHAT I SUGGESTED.  I MEAN, I

11     THINK AN ARGUMENT COULD BE MADE FOR HOUSE ARREST EXCEPT FOR

12     RELIGIOUS SERVICES AND OTHER THINGS.  SO I THINK I WOULD DEFER

13     TO THE COURT ON THE EXACT PARAMETERS OF HIS EXTENDED STAY

14     AMERICA.

15              THE COURT:  LET ME HEAR FROM MR. LEMON.

16              MR. LEMON:  I'M SORRY, WHAT ARE WE TALKING ABOUT?

17              THE COURT:  WE'RE TALKING ABOUT THE GPS.  MR. PLETCHER

18     ASKED FOR A CURFEW SO THAT HE WOULD BE RESTRICTED TO HIS

19     RESIDENCE EXCEPT FOR 7:00 A.M. TO 5:00 P.M.  HE SAID THERE

20     COULD ALSO BE AN ARGUMENT FOR HOME DETENTION.

21              MR. LEMON:  WELL, I DON'T THINK HOME DETENTION IS

22     NECESSARY.  IT WASN'T EVEN --

23              THE COURT:  PULL THE MIC CLOSER TO YOU.  I CAN'T HEAR

24     YOU.

25              MR. LEMON:  THE ELECTRONIC MONITORING IS SOMETHING THAT
```

1      ACTUALLY I SUGGESTED.  PRETRIAL SERVICES DIDN'T EVEN BELIEVE IT

2      WAS NECESSARY.  I THINK IT'S NOT INAPPROPRIATE TO HAVE

3      ELECTRONIC MONITORING.  I THINK THAT HAVING HIM RESTRICTED TO

4      HIS HOUSE FROM THE HOURS OF 5:00 P.M. TO 7:00 A.M. IS --

5            THE COURT:  7:00 A.M. TO 5:00 P.M. WOULD BE THE CURFEW

6      WINDOW.  HE WOULD NEED TO BE HOME -- ASIDE FROM THOSE HOURS, HE

7      COULD BE OUT FROM 7:00 A.M. TO 5:00 P.M.

8            MR. LEMON:  RIGHT.  I THINK THAT'S A LITTLE BIT TOO

9      RESTRICTIVE, FRANKLY.

10            THE COURT:  WHAT WOULD YOU SUGGEST?

11            MR. LEMON:  IF HE WANTS TO GO TO DINNER, HE WOULD HAVE

12      TO BE HOME BY 5?

13            MR. PLETCHER:  THE ALTERNATIVE IS INCARCERATION.  I'M

14      FRANKLY RELYING ON PRETRIAL SERVICES, WHO SHOWS UP TODAY IN

15      COURT WITH WHAT APPEARS TO BE NO REPORT, AND NO ANALYSIS, NO

16      SEPARATE INTERVIEW OF THIS DEFENDANT, WITHOUT WHAT APPEARS TO

17      BE EVALUATING ALL THE FACTORS.  THAT'S A PRETTY HARD

18      JUSTIFICATION.  THE FACTORS HERE MILITATE FOR DETENTION.  IF

19      THE COURT HAS FOUND THAT THERE ARE CONDITIONS OF RELEASE THAT

20      ALLOW HIM TO SPEND TIME WITH HIS FAMILY --

21            THE COURT:  MAYBE WE NEED TO TAKE A BREAK HERE BECAUSE

22      I THINK -- I'M NOT CERTAIN, BUT I'M SENSING THAT HAVING THE

23      CHILD AND MOTHER COME HERE MAY NEED TO BE LOOKED INTO A LITTLE

24      BIT MORE THAN HAS BEEN SOMEWHAT PROFFERED.

25            MR. LEMON:  MY UNDERSTANDING IS THAT THE CHILD WILL

1    COME HERE SOME WAY LEGALLY AND THAT THE CHILD WILL STAY WITH

2    MR. SIMPKINS.  I DON'T THINK THAT THAT'S AN ISSUE AT ALL.

3         WITH RESPECT TO THIS CURFEW, YOUR HONOR HAS FOUND THAT

4    CONDITIONS CAN BE SET THAT WILL ASSURE HIS APPEARANCE.  THE

5    QUESTION THEN BECOMES HOW RESTRICTIVE SHOULD HIS CURFEW BE NOT

6    WHETHER HE SHOULD BE INCARCERATED.

7         THE COURT:  I UNDERSTAND.

8         MR. LEMON:  ALL I'M SUGGESTING IS MAYBE 7:30 SO THAT HE

9    HAS AN OPPORTUNITY TO GO TO DINNER BEFORE HE HAS TO COME HOME.

10   I MEAN, THAT WAS ALL I WAS SUGGESTING.

11        MR. PLETCHER:  IF THE QUESTION IS WHAT CONDITIONS ARE

12   APPROPRIATE, THEN THAT'S SOMETHING THAT WE DID NOT WEIGH IN ON

13   BECAUSE I DON'T THINK THAT THERE ARE CONDITIONS THAT ARE

14   APPROPRIATE.  BUT IF SOMEONE IS ASKING ME, THEN I BELIEVE THEY

15   SHOULD BE AS RESTRICTIVE AS POSSIBLE BECAUSE THOSE THINGS ARE

16   ONES -- RESTRICTIVE CONDITIONS ARE ONES THAT ASSURE HIS

17   APPEARANCE.

18        AND SO HOME DETENTION, WHICH ALLOWS HIM TO LEAVE FOR

19   PARTICULARLY-ENUMERATED REASONS IS A MOST RESTRICTIVE

20   CONDITION.  IF WE'RE GOING TO TALK ABOUT A CURFEW, RELEASE IS

21   NOT TO GALAVANT AROUND SAN DIEGO AND GO TO DINNER.  IT'S MEANT

22   TO BE A RESTRICTIVE CONDITION OF RELEASE.

23        MR. LEMON:  WELL, THIS IS BECAUSE YOUR HONOR FOUND THAT

24   YOU WEREN'T GOING TO HOLD HIM WITHOUT BAIL, SO NOW THEY'RE

25   ASKING FOR THE MOST RESTRICTIVE CONDITIONS.  IT'S A CIRCULAR.

1    I'M SIMPLY SUGGESTING THAT IF YOU'RE GOING TO SET A CURFEW,

2    IT'S MORE REASONABLE TO MAKE IT FROM 7:00 P.M. TO 7:00 A.M.

3    THAT HE HAS TO BE IN HIS HOUSE AS OPPOSED TO 5 P.M. TO 7 A.M.

4         MR. PLETCHER:  THE POINT OF CURFEW IS THAT IF HE MISSES

5    IT, DEPENDING ON HOW MUCH LEAD TIME HE HAS MISSING IT IS HOW

6    MUCH LEAD TIME HE HAS ON PEOPLE TRYING TO FIND HIM.  AND SO IF

7    HE MISSES CURFEW AT 7:30, I'M NOT SURE THAT NECESSARILY

8    SOMEBODY IS GOING TO BE OUT IN FORCE LOOKING FOR SOMEONE WHO

9    MISSED CURFEW UNTIL THE NEXT MORNING.  AND GIVEN OUR PROXIMITY

10   TO THE INTERNATIONAL BORDER AND TO THE INTERNATIONAL WATERWAYS,

11   I'M NOT WILLING TO GIVE SOMEONE 12 HOURS LEAD TIME WHO THE

12   UNITED STATES THINKS IS FRANKLY A PARADIGMATIC FLIGHT RISK.

13        MR. LEMON:  I THINK IT'S SOUR GRAPES, FRANKLY.

14        THE COURT:  WELL, YOU'VE HEARD THE CONDITIONS.  I THINK

15   THE MORE DIFFICULT -- I'LL ADDRESS CURFEW AND HOME DETENTION IN

16   JUST A MOMENT.

17        I THINK THE MORE IMPORTANT CONDITION TO THE COURT IS

18   THAT WHOEVER HAS THE LEGAL RIGHT TO THIS CHILD IS HERE WITH THE

19   CHILD, AND HIS WIFE IS HERE, BEFORE ANY RELEASE IS UNDERTAKEN

20   BY THIS DISTRICT, AND THAT THOSE INDIVIDUALS HAVE SURRENDERED

21   ALL PASSPORTS THAT THEY HOLD.  I SAY "ALL PASSPORTS" BECAUSE

22   THEY MAY BE HOLDERS OF MULTIPLE CITIZENSHIP IS MY UNDERSTANDING

23   OF SOME OF THEM, SO I NEED TO HAVE SOME ASSURANCE THAT THEY'RE

24   GOING TO BE HERE BECAUSE THAT'S THE PREMISE OF YOUR ARGUMENT,

25   SIR, AND PART OF THE ESSENCE OF THIS.  I UNDERSTAND THE

1     ARGUMENTS.  I THINK THESE CONDITIONS WOULD ASSURE.

2          WHAT I'M GOING TO DO IS -- I DON'T THINK THE MONITORING

3     IS EVER CONVENIENT.  I'M GOING TO GO WITH HOME DETENTION, AND

4     IT IS WHAT IT IS.  IT'S SET FORTH.  AND HOME DETENTION IS THE

5     CONDITION OF THE ELECTRONIC MONITORING, AND THOSE ARE SET

6     FORTH.  SO THAT'S THE COURT'S ORDER WITH REGARD TO THIS.

7          MR. PLETCHER:  DOES THE COURT WANT TO MAKE HIS RELEASE

8     SELF-EXECUTING OR WOULD WE LIKE TO HAVE A STATUS CONFERENCE

9     WHEN HIS FAMILY ARRIVES?

10          THE COURT:  I THINK WE NEED TO HAVE A STATUS CONFERENCE

11     BECAUSE I DON'T KNOW THAT THIS IS SIMPLY OR QUICKLY DONE.  I'M

12     WILLING TO HAVE A STATUS CONFERENCE ONCE WE GET FURTHER ALONG

13     AND THOSE DETERMINATIONS ARE MADE.  I THINK THAT MIGHT BE

14     BENEFICIAL TO EVERYONE, MR. LEMON AND MR. PLETCHER.

15          MR. PLETCHER:  I AGREE.

16          THE COURT:  SO THAT CAN BE DOCKETED WITH MY COURTROOM

17     DEPUTY WHENEVER THAT NEEDS TO BE DONE.

18          MR. LEMON:  OKAY.  THANK YOU.

19          THE COURT:  THANK YOU.

20          MR. PLETCHER:  THANK YOU, YOUR HONOR.

21     (THE HEARING CONCLUDED.)

22

23

24

25

1                      C E R T I F I C A T E

2


3          I, GAYLE WAKEFIELD, CERTIFY THAT I AM A DULY
   QUALIFIED AND ACTING OFFICIAL COURT REPORTER FOR THE UNITED
4  STATES DISTRICT COURT, THAT THE FOREGOING IS A TRUE AND
   ACCURATE TRANSCRIPT OF THE PROCEEDINGS AS TAKEN BY ME IN THE
5  ABOVE-ENTITLED MATTER ON JANUARY 8, 2016; AND THAT THE FORMAT
   USED COMPLIES WITH THE RULES AND REQUIREMENTS OF THE UNITED
6  STATES JUDICIAL CONFERENCE.

7


8  DATED:  JANUARY 23, 2016      /S/ GAYLE WAKEFIELD
                                 GAYLE WAKEFIELD, RPR, CRR
9                                OFFICIAL COURT REPORTER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25